### HARRY CALYON v. THE STATE.

#### No. 3392. Decided January 27, 1915.

**1.—Assault to Rape—Sufficiency of the Evidence.**

Where, upon trial of assault with intent to rape, the evidence, although conflicting, sustained the conviction, there was no reversible error. Following White v. State, 60 Texas Crim. Rep., 559, and other cases.

**2.—Same—Functions of the Jury.**

The rule is that where the evidence is sufficient to sustain the verdict, although there may be contradictions in the testimony of the State's witnesses, this court can not legally take the place of the jury, and the only question is whether there is sufficient evidence to sustain the conviction. Following Kearse v. State, 68 Texas Crim. Rep., 633.

**3.—Same—Misconduct of Jury—Allusion to Defendant's Failure to Testify—Character Witnesses—Affidavit.**

Where the purported affidavit was made simply and solely on the affiant's best knowledge, information, and belief to his amended motion alleging misconduct of the jury in alluding to defendant's failure to testify and to place character witnesses on the witness stand, the same was insufficient, and there was no error in overruling same. Following Hicks v. State, 171 S. W. Rep., 755. Davidson, Judge, dissenting.

**4.—Same—Rule Stated—Pleading—Proof—Practice.**

Where the motion for new trial attacks the verdict of the jury on any matter outside of the record itself, defendant must as a matter of pleading supported by his own affidavit or the affidavit of someone else specifically show the truth of the grounds of the attack, and an affidavit that affiant is informed, believes, etc., is insufficient where it is not shown nor attempted to be shown from whom he received such information, etc. Following Morrison v. State, 39 Texas Crim. Rep., 519, and other cases.

**5.—Same—Oath of Jurors—Charge of Court—Practice—Misconduct of Jury.**

Where, upon trial of assault to rape, the court properly administered the oath to the jurors as provided under article 714, Code Criminal Procedure, otherwise instructing them properly, and in addition, charged them that the failure of the defendant to testify could not be taken as a circumstance against him or alluded to or commented on in their retirement, an affidavit attached to the motion for new trial that affiant to the best of his knowledge, information and belief, that the jury or some members thereof commented on the defendant's failure to testify, etc., did not require or authorize the trial judge to summons the jurors before him to answer to any such charge. Davidson, Judge, dissenting.

**6.—Same—Charge of Court—Definition of Rape.**

Where the trial judge in his definition of rape included threats, etc., but when submitting the case to the jury for a finding confined himself to the question of force only as charged in the indictment, there was no reversible error. Following Railsback v. State, 53 Texas Crim. Rep., 542, and other cases.

**7.—Same—Objections to Charge of Court.**

Where, upon trial of assault with intent to rape, the court applied the law to the facts in the case and submitted all of defendant's special charges except the one which required a peremptory acquittal and those embraced in the court's charge, general objections to such charge that he did not do so are insufficient, and there was no reversible error.

**8.—Same—Evidence—Appearance and Condition of Prosecutrix.**

Upon trial of assault with intent to rape, there was no error in permitting testimony as to the condition of prosecutrix and her appearance when she reached home about two hours after the assault upon her. Following Conger v. State, 63 Texas Crim. Rep., 328, and other cases; besides, this evidence was excluded from the jury.

**9.—Same—Facts Stated in Opinion.**

See comments in additional opinion by majority of the court with reference to facts stated in the opinion which are in consonance with the record and sufficient to sustain the conviction. Davidson, Judge, dissenting.

**10.—Same—Misconduct of Jury—Affidavit—Other Testimony.**

While the trial court under article 841, Code Criminal Procedure, may hear evidence by affidavit or otherwise and determine the issue as to a complaint of the misconduct of the jury, yet where such issue has not been properly presented, there was no error in the court's overruling a motion for new trial on that ground and refuse to summons the jurors to testify. Following Bryant v. State, 69 Texas Crim. Rep., 457, and other cases. Davidson, Judge, dissenting.

**11.—Same—Cases Discussed.**

See additional opinion and dissenting opinion discussing the decisions in the cases of Barber v. State, 35 Texas Crim. Rep., 70, and Hampton v. State, 63 Texas Crim. Rep., 100.

Appeal from the District Court of Galveston. Tried below before the Hon. Robert G. Street.

Appeal from a conviction of assault with intent to rape; penalty, four years imprisonment in the penitentiary.

The opinion states the case.

*King & Hughes* and *R. L. Pillow, Jr.,* for appellant.—On question of the court's charge on threats: Burney v. State, 21 Texas Crim. App., 565; Taylor v. State, 22 id., 529; Milton v. State, 23 id., 204; Cox v. State, 44 S. W. Rep., 157; Robertson v. State, 17 S. W. Rep., 1068; Cotton v State, 52 Texas Crim. Rep., 55, 105 S. W. Rep., 185; Shield v. State, 23 S. W. Rep., 893; Steinkie v. State, 25 S. W. Rep., 287; Matthew v. State, 31 S. W. Rep., 381; Hancock v. State, 47 S. W. Rep., 4 .; Graybill v. State, 53 S. W. Rep., 851; Ellenburg v. State, 35 S. W. Rep., 989; Sirmons v. State, 72 S. W. Rep., 395.

On question of insufficiency of the evidence: Cromeans v. State, 59 Texas Crim. Rep.; 611, 129 S. W. Rep., 1129; Blair v. State, 60 Texas Crim. Rep., 363, 132 S. W. Rep., 358; Alexander v. State, 58 Texas Crim. Rep., 621, 127 S. W. Rep., 189; Thompson v. State, 43 Texas, 583; Pefferling v. State, 40 id., 487; Eiley v. State, 55 Texas Crim. Rep., 1; Collins v. State, 52 id., 455.

*C. E. Lane,* Assistant Attorney General, and *Chas. H. Theobald, M. J. Levy* and *W. E. Crawford,* for the State.—On question of condition and appearance of prosecutrix: Burge v. State, 167 S. W. Rep., 63.

On question of court's charge on threats: Steagald v. State, 22 Texas Crim. App., 465.

On question of insufficient showing of misconduct of jury: Kannmacher v. State, 51 Texas Crim. Rep., 118, 101 S. W. Rep., 237; Tyler v. State, 90 S. W. Rep., 33; Low v. State, 71 Texas Crim. Rep., 179, 160 S. W. Rep., 98; Jack v. State, 20 Texas Crim. App., 656.

PRENDERGAST, Presiding Judge.—Appellant was convicted for an assault with intent to rape Leta Tinnin on July 4, 1914, and his punishment assessed at four years in the penitentiary.

1. Appellant vigorously contends that the evidence was insufficient to sustain the conviction. It is, therefore, proper to state some of the testimony tending to sustain the conviction. What this court said in Kearse v. State, 68 Texas Crim. Rep., 633, 151 S. W. Rep., 828, is applicable to this case. It was there said:

"There is hardly any contested case that comes to this court but what there are contradictions in the testimony, and frequently a principal witness may contradict himself in material matters. In such cases, when it is contended that the evidence is insufficient to sustain the verdict, this court can not legally take the place of the jury, and determine whether or not it will believe any witness or witnesses, and from all of the testimony, as put down on paper and sent to this court, it would have found a different verdict from that of the jury, and, if so, reverse the case on that account. The only question this court can determine is whether there is sufficient evidence, if believed by the jury, to sustain the conviction. This court passes upon that question as a question of law which is all it can legally do under such circumstances. Our law expressly provides that the jury in all cases are the exclusive judges of the facts proved and of the weight to be given to the testimony. This court therefore can not take that question from the jury without usurping authority that was never given or intended to be given to it. The jury in a felony case is made of twelve fair, disinterested, impartial, unprejudiced, unbiased, and competent jurors selected from different portions of the county, each one of whom hears all the witnesses, looks them in the face when testifying, observes their manner and the method of their examination by the respective attorneys, then hears the argument of the attorneys for each side, one side undertaking to break down the testimony of the witness and calling attention to every contradiction by others of him, the other explaining such matters, and seeking to sustain such witness, then hear and take with them in their retirement the charge of the court. Then the twelve men discuss and consider in private between themselves all such matters, and, after weighing it all and all the arguments against it and in support of it, come to the conclusion that the testimony of a certain witness, or witnesses, although contradicted and although there are contradictions in the testimony of such

witness, that it is true and they believe it. The jury is made up of men of different ages, from young to comparatively old men, and they pursue different occupations and businesses. With all these surroundings they are much more competent to arrive at the truth than are the judges of this court, who must look solely to the testimony as written down on paper. It can not portray the manner, the looks, and the deportment of the witness, nor the manner of his examination and cross-examination by the attorneys. Besides this, the presiding judge hears and sees and observes all that the jury does in the trial of the case and he then sustains the verdict of the jury. Therefore, when the evidence taken in its favorable light sustains the verdict, this court can not legally set it aside."

The statement of facts contains fifty-four typewritten pages. We have read it, more than once, and carefully studied it. The testimony establishes some of the facts without controversy. We will here state some of these.

Leta Tinnin, the alleged assaulted girl, was just past fifteen years of age. She lived with her parents in Alvin. She had never kept company with any boys prior to this and her parents would not permit her to accept company or go out alone. Most all of the witnesses, in speaking of her, designated her as a little girl. The appellant seems to have been a grown man, though his age is not stated. The little girl, Leta, had never seen him before the day of the alleged assault and he was not introduced to her on that occasion.

On said date there was a political picnic in Galveston County, on the mainland, some twelve miles from Alvin. On the morning of that day said little girl, together with a young daughter of Mr. Romine, the constable, with John Sue, in a buggy, went to said picnic. There was a large crowd of men, women and children at the picnic. They had various classes of amusements on the picnic grounds that day. The extent of the picnic grounds is not given, though there are some indications that it was on about a 100-acre tract of land and at a creek. At one locality the soldiers were racing their horses and jumping them. More or less crowd was watching that amusement. At another location they had political speakers and more or less people were giving their attention to that. At another place they had a dance stand and a dance was going on. A considerable number were giving their attention to that amusement. And at another locality was a baseball game, which, it seems, always attracts more or less attendance. There may have been other attractions also on the ground. Up and down the creek there was more or less timber and some undergrowth and brush. This extended from the creek to some seventy-five yards from it. The creek had a kind of double, or treble, bank or benches to it. A bank running up from the water a few feet high and extending back perhaps some eight or ten feet. Then another bank or rise several feet high and extending to another bench; then, it seems, still another to reach the apparently level ground.

Along about 4 or 5 o'clock in the evening the little girl, Leta, her com-

panion, Drewie Romine, the 14-year-old daughter of the constable, and an associate and companion of Leta, and perhaps her little sister, were at the dance pavilion watching the dance when appellant approached her.

We now give some of her (Leta's) testimony. She said: "He walked up to me and asked me to dance with him. I told him I couldn't dance. He says, 'Will you go in bathing with me?' I says, 'There are no girls in bathing; I am not going in when there are no other girls in.' He says, 'There are, too, and come with me and I will show you.' I sort of did not want to go at first, and then I says, 'I will go with you, but I know they are not there.' The girls were not in bathing. We walked down that way a little ways and he says, 'Stop,' and I stopped, and he put his arms around me and says, 'You are the sweetest girl I ever saw,' and tried to get me to kiss him. I would not do it. I started to cry and told him to turn me loose, and he says he would not do it until I kissed him. He tripped me and then I fell, and he kept trying to get me to kiss him. I would not do it. I said, 'You let me up, I got to go,' and he says, 'You kiss me.' I says, 'I am not going to do it.' I started calling for help and nobody didn't come to me, and he kept trying to get me to kiss him and I wouldn't do it. He told me to take hold of his root. At that time, when he told me to do that, he had his hand over my mouth, and his mouth over my mouth part of the time, and told me to hush, and I would holler, and he would keep trying to get me to, and I wouldn't do it. He says, 'Take hold of my root,' and tried to feel my breast. I don't remember the exact words he said then, if anything was said. He tried to get me to let him feel of my breast and I told him to quit. At that time, when he asked me that, I was on the ground; he had tripped me. We was both on the ground. He was on the ground. I was trying to get on my side, as near as I could and he would get right on top of me. He would get right on top of me. At that time I did see a portion of his private person. He just stuck his hand down under me and commenced undoing his pants. At that time he was lying down. After he said to do this and when he exposed his person, as I testified, well, he was trying to get me to—tried to put his hand over my mouth, and he was putting his mouth in mine, and I would bite him, and one time he put his mouth in mine and I just reached up and pulled his hair, and I just lay over on the ground; and act sort of like he was crazy, and he was not. He would try to get me to hush hollering. He told me to hush, and I said I would not, and I said, 'Let me up.' I said, 'Let me up or I will holler.' He says, 'If you holler and tell on me, I will kill you.' When I fell on the ground and went down on the ground and he tripped me, the condition of my clothes as to whether or not they were down on my body, they were down. He pulled my dress up as far as he could get it, and had his hand that way. He put his hand under my slips. My slips, that was the last underclothing next to my skin. I was trying to get someone to come after me; I hollered, 'Help.' I hollered it loud. I hollered for help all the time. Well, after that, one time I started to get up and he says, 'Don't you run,' and grabbed me right here at my dress, and I stopped to

pick up my umbrella and he took hold of me again. At first they heard me, and Drewie walked down that way by herself; then she turned around and went back and told my little sister; that is Drewie Romine. There was someone else there. My little sister came there. Next after my sister came, well, Mrs.—I don't know, I can't call her name,—Mrs. Kavelder, the name you just called; she was in the buggy; she came down there and said, 'You rascal, you get up and run.' He was trying to get me to take hold of it then; she came and says, 'You better run, you rascal,' and he got up and ran, started— . . . I did not give my consent to the defendant to make this assault upon me or to commit the offense, or have sexual intercourse with me; I was fighting him all the time. I was crying at that time when Mrs. Kavelder came up. At the time I was fighting him or scratching him, I made some marks upon the defendant, several times, right along there (indicating face). . . . When he came up to the grandstand and spoke, Drewie was with me there, and another little girl; he asked her first. It was Drewie Romine and another little girl. She is not here this morning; I know her name but can't think of it. I know her well."

This little girl, Leta, just past fifteen years of age, was subjected to a very lengthy, searching and exhaustive cross-examination by one of appellant's able attorneys, who had had extensive experience as an attorney in all character of cases. It is not strange that she may have under such circumstances, given testimony contradictory of herself or perhaps in some particulars weaken, in others strengthen her direct testimony. We do not propose to give in detail her testimony upon cross-examination, but we will give excerpts from it.

She described the various things about the picnic grounds the best she could. Among other things, stating in substance, that they entered the picnic grounds at a gate from the Dickerson road; that the dance pavilion was about a half mile or less from this gate; that trees extended up and down the bank of the creek and for some fifty to one hundred steps from the creek, all along. The dance pavilion was on the outer edge of this grove of trees from the creek. "Coming from the dance pavilion when I and the young man started away, we went down the creek toward the Dickinson road; the pine trees are pretty thick along there. . . . Coming from the pavilion, where I say I met this defendant, down to the creek toward the shell road, I and the defendant walked down the little path that led toward the pavilion down to the creek, and to the brow of the hill on the second bank, and we took that little path and walked down skirting the creek. . . . He did not say which way he wanted me to go. He walked off then towards the road down the creek to the bank of the creek and I went with him. I remember that coming up the creek the other way the brush comes down close to where the dancing was. There is brush the other way; where we went it was pretty thick; we were in a trail. . . . I did not notice anything when the defendant came to talk to me, as to his acting strangely in any way. From the time he asked me to go down to the creek, he didn't leave me. And as to his telling me there were some

girls in swimming down the creek, and asking me to go swimming with him and my telling him that I didn't believe there were any girls down there, and if there were I would go in swimming; I didn't tell him that, I said I would go down to see, but won't go in swimming. I would not go in at all. Just go down there to see if there were any girls in swimming. . . . You can not see from where we were; you could not see the creek from the road where we were. . . . I didn't see any women; I thought I would satisfy my curiosity and go down there with him to see if there was anybody in bathing." She could not tell how far it was from the dance pavilion when appellant stopped her and threw her down, nor can we tell with anything like certainty from the statement of facts, but it must have been, as we judge from the testimony, not less than two hundred yards and probably some distance further. She further testified that in walking off with appellant, "I did not catch hold of his arm. He was a little behind me; he had hold of my arm. I guess he was holding my arm to keep me from slipping. I was not trying to walk right up against him. He held onto my arm until we came to this first place we stopped. . . . He had not attempted to put his arm around me until we stopped. And when we stopped, he put his arms around me, and hugged me and asked me to kiss him, and put his arms around me. At that time, I told him to turn me loose; I don't exactly remember whether or not I screamed then. . . . I told him to turn me loose real loud. . . . He did not turn me loose at once; he would not turn me loose. Then I began to scream; he tripped me, too. Then I was screaming as loud as I could, one after another, but he put his hand over my mouth. I screamed two or three times, and then he put his hand over my mouth. . . . I was fighting him all the time, shoving and pushing, before I got on the ground. If I got loose, I was going to run and tell the people. . . . I don't remember how he tripped me; he put his feet under mine, or something. I fell sort of on my side when I fell. He got on top of me. When I fell, he went down with me, on top of me. I was screaming when he would let me. He didn't have his hand on my mouth then. He didn't say anything then; just lay there; after a while he would say, 'Let me kiss you,' and I said, 'I am not going to do it.' He did not just lay there on the side of me; it was on top of me. He was laying up and down of me. He wouldn't let me get on my side. He was on top of me. And I was screaming when he didn't have his hand on my mouth. . . . I was angry with him, I was crying. . . . He would hold himself up on one hand and put his hand on my mouth with the other. My dress sort of flew up, about as high as my knees (when she fell). . . . He did not reach down and pull my clothes up over my head, not then. He made no effort at that time to pull my clothes up over my head. He begged me to kiss him, and part of the time he would lay over on the ground and hold his hand over my mouth and me kicking and screaming, and he would take his hand off and kiss me; and I bit him. I bit his mouth when he kissed me, and the blood ran out on his face. . . . I got up on my feet once. He

did not get up, too. He got on his knees and grabbed me here (indicating place on dress) and tore my dress."

In the cross-examination of this little girl he had her to state that the time appellant was engaged in this assault on her was longer than five or ten minutes, was longer than twenty minutes and she said perhaps as long as thirty minutes, or still longer. Appellant's witness A. G. Fallette swore that he was walking the horses back and forth on the edge of the timber opposite the dance hall, back the other way towards the shell road; that he noticed appellant and the little girl Leta going down towards where the assault is alleged to have occurred; that they had not passed him more than five minutes when he heard loud talking and some cursing down in that direction; (this was doubtless John Sue); that a little boy came along and he asked him to hold the horses and he then saw someone (Sue) after appellant; that a large lady (Mrs. Kavalder) came up and talked pretty rash to him; she threatened to hit him with her parasol. "From the time I saw this couple go down towards the creek before I saw this incident happen (Mrs. Kavalder's attempted assault upon him there) it was not more than five or six minutes; I am satisfied not more than five or six minutes."

The little girl Leta further said she was screaming all the time. "When he first told me to put my hand on his person, that was after I fell on the ground. After laying there a long time begging me to kiss him, and holding his hand on my mouth, he took my hand and tried to make me put my hand on his person, and I would not do it. He had unbuttoned his clothes; that was while on the ground. He did not take both hands to unbutton his clothes. He held me with one hand and unbuttoned his clothes with the other, and I didn't get away from him then, not exactly then. And I would not put my hand on his person. He had his hand on his person and asked me to do so. Then he let loose of his person and asked me to take hold of it; I don't know exactly how long he carried on that way, begging me to put my hands on his person. I finally got up and he caught hold of me and pulled me back. When I was standing up, I took hold of a tree and tried to stay up, and he would not let me, and down I went again. As to whether he ever turned me over on my back and pulled my clothes up, except where they blew up when I fell, he pulled my dress up first, and slipped his hand up my leg, about here (indicating to above knee). He slipped his hand up my little pants, and he did that while lying there by me, and he put his hand on my leg. . . . He would run his hands up my legs and pat me on the leg, and I had been taught that it was wrong. He was trying to get me to love him. I didn't want to, I didn't have any use for him. This is all he ever did, about having his hand under my clothes. He never went any further. He tried to get me to play with his person. . . . He was trying to feel of my breast all the time, and pat me on the leg with one hand and on the breast with the other. He had one hand up my panties, and sometimes one over my mouth, and sometimes on my breast. At the time the Romine girl came up he was wanting to love me and was kissing me, and had his hand on

my breast, and I was screaming as loud as I could, and he would not let me. I did not say anything to the Romine girl, not a thing. She went back for help; she was upon the hill and I could see her. At that time he had his hand over my mouth. One of his legs was over me then, one over me and one not. He didn't try to get me to take of his person at that time. It looks to me like he was trying to hurt me. He put his hand over my lips. He put his hand over my throat, too, tried to keep me from hollering. He did not hit me at any time. It appeared to me he was trying to keep me from getting away. He wanted me to kiss him. . . . The little Romine girl went back up the hill and then her and Mary both came; my sister Mary ran across, and Mrs. Kavalder—"

On redirect examination, among other things, she testified that when appellant tripped her, he still held her; she didn't know how he tripped her, whether he pushed her backwards or to one side or how. She said: "He was trying to keep me from hollering all the time. As to whether I was laying there still or struggling; I was trying to get up. I was scratching him with my hands, trying to get away. I didn't permit him to put his hands down to try to make me take hold of his person; I didn't want to. At the time he took his hands to pull my dress up, and put his hand under my slip, I did not allow him to do that; I didn't want him to. To prevent it, I took hold of his arm here, and tried to push him away. I was struggling. I could not struggle any harder than I did; I was struggling my best. He was using his hands and his feet trying to hold me. All this time that I was struggling to keep him from doing this, he was trying to keep me from hollering; he was trying to get hold of me; he was trying to take hold of my breast. He had two hands. These things were taking place pretty fast, whenever he tried to get me not to holler. He put his hand over my mouth, and his mouth over my mouth, and his hand over my throat. As to whether or not I know how long a half hour is, or is that my best estimate, well, I don't know; it was a long time, it seemed to me." It doubtless did seem a long time—an age—to this little girl.

On recross-examination she said: "At the time the lady (Mrs. Kavalder) came down with that parasol, the defendant's person was exposed; he was trying to hide it. She came down, she was on the hill and his person was out then. When he got up his person was exposed. As to whether he turned his back to the crowd or his face, he sort of sneaked back like that. I don't know if he put his person up and buttoned up his clothes. I did see it distinctly. When I saw it, it was just hanging out, just like your wrist dangling around. (Indicated by counsel dangling his wrist.)" This is shown to have been after the other two little girls had heard her screams and calls for help, and saw her condition and ran back for help and after Mrs. Kavalder had hastened to the relief of the little girl and had holloed at the appellant, called him a brute, told him to get off the girl and he did sneak back off of her. Surely under these circumstances it is no surprise that his tool was "dangling around."

Said witness Drewie Romine testified that she was at the grandstand when appellant came up and spoke to the little girl Leta; she, Drewie, was then noticing another man and her mind was off of them, but she heard him ask her to dance and she told him she did not dance. Drewie then turned around and didn't notice appellant and Leta until she saw them walking off apiece from her. That soon after that when they were getting ready to go home, "I walked that way and heard her (the little girl Leta) holler for help. When I first heard it, I went on down a little ways and she hollered again, and I found it was behind me, and I turned around and went back. I went about where I thought the hollering was. I could not see anything when I got there; I was so excited I didn't pay any attention. I saw Leta there; I saw that man and Leta. They were lying on the ground, and I could hear a little mumbling noise. I didn't stay, I turned and ran; they were lying on the ground. I heard her holler about three times. She just hollered 'Help' in a loud screaming tone. After that I went back to her buggy. When I saw them on the ground there, I think they were moving some. I did not look at them very long, as soon as I saw them I ran back. I saw she was lying on her back. He was lying on his stomach. He was lying kind of on her when I saw them. . . . After I heard the screams, when I got there, there was nobody else there besides these parties, not around there; there wasn't anybody. I don't know just how far it was I was away from them when I first heard Leta scream; it was just a little ways from them, because when I first heard it, I was past them, and then I turned and went back. It was only a little piece. Just as soon as I saw them, I ran back to the buggy. I went as hard as I could go."

On cross-examination, among other things, she testified that she had started down the creek and had gone some distance. She said: "The first time I heard someone holler was when I was past the buggy and was going to the bridge. I had started along the brow of the hill toward the shell road in the shade. I had gone further than fifty or sixty steps; I don't know how far it was. . . . When I heard the screams I had passed on the brow of the hill, and passed where the scream came from. I looked back; I heard her holler again and I turned back. I didn't see them when I turned back, not until I got straight up from them. I came back to the brow of the hill, and when I got up above them, I could see them. There were some bushes and weeds. They were close to the water, it was closer than fifteen feet to the water. It was about ten feet. . . . After I heard her holler the second time, I went back a little piece and then saw her. . . . He was lying on his side with his leg over her. I could not tell what they were doing. . . . I did not say anything to them. I went within about ten feet of them. I don't know whether she saw me or not; she did not say anything to me. I went back and looked at them and then broke and ran. I heard a little mumbling noise, but could not understand. I saw her dress a little above her knee. I did not see where the boy's hands were." This witness then shows that she ran back to the buggy and

got Mr. John Sue, who was in the buggy, and they ran back down to where the appellant and Leta were. And when they got back down there the appellant was running away from there; that Mrs. Kavalder was then there and got there before she and John Sue did.

On redirect examination she testified: "When Leta came up to me from Mrs. Kavalder, her dress was torn; the lace was torn, the lace in front of her waist, and there were grass stains on her dress. . . . The reason I ran and told John Sue, I went for help; I went to get help to help Leta." And then she explained the position the parties were lying when she first saw them. She said, "She was lying on her back and he was lying on her, a little back, and kind of on his stomach." On recross-examination, among other things, she said the stains were all over her underskirt; that she didn't see any on her shoulder, nor on the stomach of her dress, nor on the knees of her dress.

Mrs. Mary Kavalder testified that she lived on a farm at Alta Loma, in Galveston County, and saw the little girl Leta that evening. She said: "I and Mrs. Dulce drove in the park and a little girl came running and hollering and screaming that a man had her sister, and we should help. Mrs. Dulce said to me to run over, and I took my parasol and ran with the little girl. Then I saw the fellow laying on the girl there, and I held up my umbrella and hollered, 'Let that girl go.' Then he crawled on his hands and feet back to the bushes and then he ran. The little girl was laying flat on her back. He laid right flat on top of her. She laid there, when I came she jumped up; when he crawled off of her. When I first saw them—I did not see anything, I just run; I was some distance away from them when I hollered; then he raised up his head and he crawled back on his hands and feet backwards, then turned away from me and ran. The little girl jumped up and came to me and grabbed me around the neck and thanked me. She said, 'I thank you, lady, for coming and helping me, and saving me.' She had her dress in front all torn open. She shook like a leaf. No portion of her body was exposed at that time, not that I seen, only her breast. When she made these statements, 'Thank you, lady, for coming up here and helping me,' she was excited and nervous. She cried; she cried when I saw her. I did not see any portion of the defendant's person at that time. I run sideways up to him and he crawled back and he had his back to me before he got up."

On cross-examination this witness showed that when they drove in the gate from the Dickinson road they drove by the grandstand, where people were dancing; that it was further than one hundred yards, and she jumped out of the buggy when about half way between the road and the grandstand; that it was from a quarter to a half mile from the grandstand to the road; that when she got out of the buggy and went down the hill it was back a piece to where these parties were; that they were pretty close up to the creek, within about ten feet of it, she judged. She said: "I could not see them because it is high and bushy. When I got to the brow of the hill I could see them perfectly plain then. From where they were, you could not look up and see where they were

dancing, where the grandstand was. You could see the people when you got up on the hill, but not from where I was at all. I am sure of that. . . . As to there being lots of brush around there where they were about ten feet high, there was not right there, but around there. They were not just exactly in the brush hiding, either. There were brushes, sure, but they were not in the brush, but they had brush right at the side of them. It was up to the water. He was not lying up to the edge of the water. His head was in the direction up to the picnic, it was parallel to the creek; he was lying along with his side to me, when I came down, the side was to me, and their heads down to the pike; and some little girl came running up to where I was. I saw the Romine girl that day. She was not the girl who came running up to me. John Sue was not there when I got there, but he came after. I chased him (the defendant) away. And when I chased him, he ran along the bayou. He did not go down the creek away from the crowd; he went toward the crowd. He was running as fast as he could. I did not see anything when I came up there. I told him, 'Let that girl alone.' I said, 'You dirty brute,' and held my umbrella and wanted to hit him. I was not so close; he ran away. . . . When I rushed up to them I saw he was on top of her. He was right flat over her. I can not say if he had her dress up over her head and down between her legs, because he took his hands this way over the girl's back. . . . I seen this girl's dress all torn and he lay flat on her. While he was lying on top of her, I did not see any legs waving in the air and kicking. It looked like he held her arms down. I think he had both of her hands. . . . When I came up he was just lying there holding her; he laid right flat on her; I don't know if he was holding her or not. . . . When he crawled off of her, he crawled backwards, then backed away the way his feet were. He got on his hands and knees until he was back in the bushes, on all fours, until he was so far he turned back in the bushes. . . . She jumped up as quick as he let her go. She jumped up as quick as she could, and he jumped back on his all fours, and then turned his face to the bayou and ran."

On redirect examination she said: "This screaming I heard, just before coming down that way, it came up from the bayou. A little girl came running up to us and hollered that a man had her sister." On recross-examination she said: "Besides myself, that little girl was around there. There was nobody else in hollering distance."

Mr. and Mrs. Tinnin, the father and mother of the little girl Leta,. testified to the torn condition of the little girl's clothes when she reached home that evening. This evidence was later excluded by the court.

John Sue testified that he had been boarding or working for the little girl Leta's father continuously for five years prior to this occurrence; that he had known said little girl ever since she was about ten years old; that her father was an old school mate of his and they were born and reared in the same country and had been good friends all the time as their fathers before them had been; that he weighed 152 pounds and was six feet high—taller than the appellant, though he guessed the

appellant would weigh as much as he did. That along about 4 o'clock that evening he was preparing to start home and went to where some of the little girls were and told them; he then went back to his buggy and got in it. Drewie Romine came and gave him the alarm of the assault on the little girl Leta; he at once jumped out of his buggy, ran down the bayou to where the assault occurred; that Mrs. Kavalder reached there before he did; that he saw both the little girl Leta and appellant there. The best we can get from his testimony is that his buggy was something like 150 yards from the grandstand and where the assault occurred was 140 or 150 steps beyond that, further from the grandstand; that Leta was still there with Mrs. Kavalder and appellant had not left the scene, but then started to leave and he holloed to him to stop, began cursing him, but that appellant ran towards the grandstand and he followed him for about 100 yards. "And he came up on the bank and ran into me and I got him. I saw his face at that time. There looked to be finger prints on his face, not scratches, but kind of welts, and one place that was bleeding. I believe that was on the right side (indicating) behind the ear." That appellant's pants were unbuttoned when he first saw him and he was trying to fasten them; they were unbuttoned in front from top to bottom; that when he first got to the scene the little girl Leta was crying; he couldn't understand what she was saying to Mrs. Kavalder, she tried to talk, but crying like she was, she couldn't. "And when I saw him, his pants were unbuttoned from top to bottom and just flared out;—it didn't seem that the hook up here—as to whether his shirt was pulled out,—there was something showing, I did not see his private. I immediately told him to stop. . . . He said, 'I have not done anything and you had better let me alone'"; that he was then about fifteen or twenty feet from him. He was up on the brow of the hill and appellant was below; that appellant then commenced to run, and remarked, "I haven't hurt the little girl; I wasn't going to hurt her; I was taking her down to where her friends were." The witness said it was then that they ran together and that he was going to stop him at any cost; that soon after this the officer came up and arrested appellant.

The constable, Mr. R. H. Romine, testified that he was at said picnic and saw appellant there that day; that when he first saw him he was walking as fast as he could, leaving the crowd; this was after the assault and after he had gotten up towards where the crowd was, near the grandstand. Mr. Romine said: "I saw his face that day. His lips were bleeding; I don't know whether it was something wrong with his lips, but he had a little blood along here (on his face). I don't know whether it was marked or just blood from his lip, along the side of his face, but his lip was bleeding."

We think it unnecessary to further state any of the evidence. From what we have given and from the whole of the testimony, the jury were clearly justified to believe therefrom that the appellant, a grown man, enticed this little girl Leta away from her friends and from the crowd, some considerable distance, to a secluded place, hidden from her friends

and from the crowd, and assaulted her for the purpose and with the intention of ravishing her; that she was a right young girl, inexperienced and unsuspecting; that she did all that she reasonably could to repel and prevent his assault upon her and that he doubtless would have accomplished his purpose if the screams and calls for help by the little girl had not attracted others who came to her rescue and ran him off of her. We think there can be no doubt of the sufficiency of the evidence to sustain the conviction, and, of course, the court did not err in refusing to give his special charge instructing the jury peremptorily to acquit him. While perhaps no case exactly in point could be found because each case must, more or less, be bottomed on the facts therein, yet we cite as in point, White v. State, 60 Texas Crim. Rep., 559; Ross v. State, 60 Texas Crim. Rep., 547; Stewart v. State, 60 Texas Crim. Rep., 92; Conger v. State, 63 Texas Crim. Rep., 312.

2. Appellant's first bill of exceptions shows, in substance, that the verdict herein was rendered November 3, 1914; that two days later he filed his motion for new trial. In that motion he did not allege any misconduct of the jury. The trial judge fixed November 14 for hearing the motion. On November 11, by leave of the court, appellant, for the first time, complained of the action of the jury, as follows:

"8. Because of the misconduct of the jury trying this case in this: That said jury or some members thereof upon their retirement to consider this case, and after the charge and argument of counsel commented upon the failure of the defendant to testify in his own behalf and upon his failure to place character witnesses upon the stand in his own behalf, and considered such failure to testify and failure to place such witnesses on the stand in arriving at their verdict in this case.

"The matters set forth in the foregoing paragraph are charged to be true by the counsel for the defendant who signs this motion based upon information and belief and they verily believe and charge upon such information and belief that such are the facts.

"Wherefore, this defendant prays this court to set this motion down for a hearing, and that each and every juror that sat in this case be subpoenaed to appear before your honor and that they be placed under the rule and that they be examined by these counsel in open court under oath singly as to the matters in this section eight of this motion.

"Finally this defendant prays that after a fair and full hearing upon this motion that your honor do grant the same in all things and award to him a new trial as in law he is entitled to have.

          (Signed)          King & Hughes,
                              R. L. Pillow, Jr.,
                              Attys. for Defendant.

"The State of Texas,
"County of Galveston.

"Comes now Harry Tom King, one of the attorneys of record for the defendant herein, Harry Calvon, and in the above styled and numbered cause and upon his oath says that the matters set forth in paragraph 8

of this motion are true to the best of his knowledge, information and belief.

(Signed) "Harry Tom King.

"Subscribed and sworn to before me this the 11th day of November, 1914.

"L. R. Patton,
"Notary Public in and for Galveston Co., Texas."

That on the next day one of his attorneys presented, in person, to the trial judge a carbon copy of his amended motion and told the judge he had filed the original with the clerk and asked for an early consideration relating to the misconduct of the jury; that a few hours later he asked the judge if he had read the motion, and he stated that he had. Whereupon he asked that he direct the clerk to issue process for the jurors as prayed for in said motion; that the judge stated emphatically that he would do no such thing; that he would have nothing to do with that portion of the motion setting up the misconduct of the jury; that he at once applied in writing to the clerk for process for each and all of the jurors, naming them, but not stating what their avocation was, nor their location; that when this was presented to the clerk, the clerk stated positively that he would decline to issue the subpoenas, unless forced to do so by mandamus; that on November 14, when the motion was heard, appellant was present, and his attorneys suggested that he wanted to take up the action of the court and clerk in refusing process for the jurors; that none of the jurors were then present and in attendance. Thereupon, he offered in evidence, particularly, that portion of his motion above copied, the file marks on the application for process and file mark on it and what happened and transpired concerning the amended motion and application for process stated above, and then: "There was then offered the testimony of R. L. Pillow, Jr., one of the counsel of the defendant, who stated that he had talked to one of the jurors who tried the case of The State v. Calyon, No. 17,019, docket of this court, and that he had after such conversation furnished the counsel, Mr. King, who prepared and swore to the amended motion for a new trial now on file in this cause information concerning what had transpired between him, the said Pillow, and the said juror; and that he had truthfully passed the information received from the juror to his co-counsel, Mr. King. The defendant then offered the testimony of Mr. King, one of his counsel, who stated that he had prepared Section 8 of the defendant's motion for new trial upon information communicated to him by Mr. R. L. Pillow, Jr., of counsel for the defendant, and that he had made his affidavit thereto based upon such information so received. "And it being agreed in open court between the State and counsel for defendant that the foregoing matters herein set out truly reflects the situation concerning that part of the defendant's amended motion for new trial setting up the misconduct of the jury, the defendant by his counsel then and there in open court excepted to the failure and refusal

of the court trying this case to direct the clerk of this court to issue process upon the application as herein set out and excepted to the failure and refusal of the clerk·of this court to issue process upon the application herein set out even without the direction of the court for the reason: That misconduct of the jury having been alleged under oath in the motion for new trial filed herein and an application directed to the clerk of this court having been made by one of the counsel for the defendant under oath asking for process to compel the attendance of said jurors on the date set for the motion for new trial to the end that the matters of misconduct charged might be inquired into, and said application having been reasonably made, that then and in that event defendant was entitled to the process of this court as prayed for.

"Wherefore, the defendant now presents this his bill of exception No. 1 and asks that this court examine, approve, allow and order the same filed as a part of the record in this case.

"The foregoing bill of exception having been presented to me and examined the same is now approved, allowed and ordered filed as a part of the record in this case.   This the 23rd day of November, 1914.

"Robt. G. Street,
"Judge of the 56th Judicial Dist."

This presents the only serious question in the case.   The purported affidavit of Mr. King is simply and solely to the effect that: *"to· the best of his knowledge, information and belief"* said *jury or some members thereof,* "commented upon the failure of the defendant to testify in his own behalf and upon his failure to place character witnesses upon the stand in his own behalf and considered such failure to testify and failure to place such witnesses on the stand, in arriving at their verdict in this case."

In our opinion this amounts to no affidavit at all.   The bill clearly shows that Mr. King had no *knowledge* whatever about the supposed misconduct of the jury; that he did not give what his claimed *information* was, nor did he give who his *informant* was.   Mr. Pillow, one of appellant's attorneys, who claimed to have talked to one of the jurors, made no affidavit whatever.   Neither did their client, the appellant, make any affidavit.   On the hearing of the motion, neither appellant nor his attorney, Mr. King, nor his attorney, Mr. Pillow, even told who the juror was that Mr. Pillow claimed to have talked with.   Nor did any or either of them tell what said juror had said to them.   Nor did any or either of them give any reason or excuse why they did not produce the affidavit of said juror or any other juror, nor in any way show that that juror or any other failed or refused to make any affidavit, or that any of them had been approached for that purpose or requested to do so.

In the case of Hicks v. State, 75 Texas Crim. Rep., 461, 171 S. W. Rep., 755, we thoroughly examined, cited, quoted and stated some of the authorities on this subject.   In that case one ground of the motion for new trial complained of the misconduct of the jury, alleging they

arrived at their verdict by lot, and stating therein that "defendant was
advised and believed, and the facts were that the verdict was so arrived
at." That motion was not sworn to, but was signed by his attorneys.
When that motion was heard by the trial judge appellant had eight
members of the jury in open court and asked permission to swear them
"by whom defendant's attorneys stated they believed and said that they
had been so informed, they could prove that the verdict was arrived at
in the manner," which would be by lot, particularly set out; that the
trial judge refused to permit the jurors to be so sworn and testify, stating
that "no issue as to the misconduct of the jury having been submitted
to the court, the jury was not permitted to be sworn and impeach its
verdict, which appeared not impartial or unfair under all the facts of
the case." This court sustained the action of the lower court in that
case and held that the judge committed no error and affirmed that case,
which was a conviction for murder in the second degree with a punish-
ment of nineteen years confinement in the penitentiary. The basis of
the holding of this court in that case was that the court properly refused
to hear the jurors and· have them testify, although in actual attendance
for that purpose, because the attempted pleading in the motion averring
said misconduct of the jury was not sworn to by appellant or anyone for
him. In this case, while there is a purported affidavit, it is not really
so and is in fact, and in effect, no affidavit whatever.

In the Hicks case, among other authorities, we cited, approved and
quoted 14 Ency. P. & P., p. 904, as follows: "When the ground for a
new trial consists of extrinsic facts and matters not of record, such as
irregularity of the court, jury, . . . or misconduct . . . the
proper method is to set forth the facts by affidavits in support of the
motion. . . ." We also cited, approved and quoted 12 Ency. P. & P.,
pp. 557-8-9, as follows: . . . "When a party moves for a new trial
on the ground of misconduct which occurred during the trial, he must
aver and show affirmatively that both he and his counsel were ignorant
of the misconduct charged until after the trial.

"*An application for a new trial on the ground of misconduct must be
supported by affidavits as to the facts.*

"An affidavit to secure a new trial on account of the misconduct of a
juror must clearly set out the facts constituting the alleged irregularity.

"*The affidavit should be positive as well as specific, and should be
sustained by oath and not merely founded on information and belief.*"

And in that case we further said: "We think there can be no sort of
doubt but that these authorities establish, beyond question, that in order
for appellant to have had considered his ground of motion attacking
the verdict of the jury on any matter extrinsic the record itself, that,
as a matter of pleading, he must support it by its own affidavit or the
affidavit of someone else specifically showing the truth of the grounds
of attack. And when it is not so sworn to or supported it presents no
question requiring the lower court to consider or investigate it."

Our statute (art. 837, C. C. P.) says: "New trials, in cases of felony,
shall be granted for the following causes, *and for no other:* . . .

"8. Where, from the misconduct of the jury, the court is of opinion that the defendant has not received a fair and impartial trial; and it shall be competent to prove such misconduct by the voluntary affidavit of a juror; and a verdict may, in like manner, in such cases, be sustained by such affidavit."

This court has all the time held that in an affidavit for a continuance which states that defendant "is informed and believes," in setting out what the absent witness will swear, is wholly insufficient. (Labbaite v. State, 6 Texas Crim. App., 257.) In the very recent case of Byars v. State, decided December 9, 1914, wherein appellant claimed that the court erred in refusing his application for a continuance and wherein he swore what the witness would testify "so defendant has been informed," this court, through Judge Davidson, said: "It will be noticed that the facts expected to be proved are not stated, except upon information. Appellant nowhere, in the application, nor attached to it, shows or attempts to show from whom he received such information. If appellant had been informed that the absent witness would testify as indicated, *his source of information should have been stated and verified.*"

So it has all the time been held by this court that in such application for continuance a mere statement that the appellant has used due diligence to obtain the witness is wholly insufficient; that the application must set out what the diligence is so that the court can tell therefrom whether or not the proper diligence has been used. (Henry v. State, 38 Texas Crim. Rep., 306; Cocker v. State, 31 Texas, 498.)

So it has all the time been held by our Supreme Court that in an affidavit for attachment it must state positively the facts on which the attachment is sought and that when it is stated merely on information and belief it is wholly insufficient to authorize or sustain an attachment. Sydnor v. Totham, 6 Texas, 189; Dunnenbaum v. Schram, 59 Texas, 281; Lewis v. Stewart, 62 Texas, 352.

In 2 Cyc., 25, it is said: "Where material allegations are made on information and belief the source of information and grounds of belief should be set out and a good reason given why a positive statement could not be procured."

In Black v. State, 41 Texas Crim. Rep., 185, this court, through Judge Davidson, said:

"Appended to the motion for new trial is the affidavit of George H. Giddings, stating that he is a member of the firm of Culp & Giddings, counsel for appellant, that defendant did not testify in his own behalf and that subsequent to the return of the verdict he talked with Holman, one of the jurors, who informed him that some of the jury discussed defendant's failure to testify, while out deliberating upon their verdict. He further states that he prepared an affidavit showing the facts, and requested Mr. Holman to sign it, but he declined to do so until he could see his fellow jurors, and a request was made that the court inquire into the truth of the matter. None of the jurors filed affidavits." He then shows that what purported to be a statement of facts on this question was filed after term time and for that reason could not be consid-

ered, and he concludes the opinion by saying: "For the reasons stated, we believe what is set out as a statement of facts in regard to the alleged misconduct of the jury can not be considered; *nor the affidavit of the attorney of appellant, because it states no fact, and is not even supported by the affidavit of his informer."*

In 2 Thompson on Trials (2 ed.), sec. 2616, it is said: "That presumption of right acting which attends all official conduct, extends to the conduct of juries, and, as a general rule, this presumption can only be overcome by clear and satisfactory proof. A new trial will not be granted where the evidence fails to make out a fair presumption that the jurors were guilty of misconduct. The evidence to establish the misconduct must be clear and positive. *The mere statement by an affiant of his impressions counts for nothing; and the same may be said of affidavits made on information and belief—at least unless such affidavit discloses from whom the affiant acquired his information, and then it must appear why the testimony of such person can not be had."*

It has always been held by this, and our Supreme Court, that in applications for new trial on account of newly discovered testimony, the affidavit of the new witness must be produced, or good cause shown why it is not done. Cotton v. State, 4 Texas, 260; Campbell v. State, 29 Texas, 490; Cole v. State, 40 Texas, 147; West v. State, 2 Texas Crim. App., 209; Love v. State, 3 Texas Crim. App., 501; Polser v. State, 6 Texas Crim. App., 510; Evans v. State, 6 Texas Crim. App., 513. And if the affidavit alleges information derived from another person, the name of such other must be disclosed, and his affidavit be filed or the want of it accounted for. Williams v. State, 7 Texas Crim. App., 163; Blake v. State, 3 Texas Crim. App., 581. Any number of cases to this effect down to this date could be cited, but it is unnecessary. No case can be found to the contrary. When the affidavit is to the effect that some other told affiant, such affidavit "is purely hearsay," and is wholly insufficient. (Tyler v. State, 48 Texas Crim. Rep., 611.)

When our Supreme Court had criminal jurisdiction, in Dignowitty v. State, 17 Texas, 521, p. 532, it said: "The application for a new trial resting on the unsupported affidavit of the party, was manifestly insufficient, though its force had not been impaired by the counter affidavit or by anything appearing to the contrary, of the matters deposed by the accused."

In Jordan v. State, 10 Texas, 479, our Supreme Court said:

"This court can not notice the mere statements of counsel made in their motion for a new trial." And further, on page 502, said: "In considering the motion, the court may judge, not only of the competency, but of the effect of evidence. There may be cases where the court might well grant a new trial, if, in the opinion of the presiding judge, injustice had been done; while, at the same time, should a new trial be refused, this court would not be warranted in reversing the judgment. The judge who presides at the trial is afforded much better and more ample means of judging of the merits of the application than the revising court can be. And, therefore, it is the governing rule of the action

of this court, affirmed and enforced by repeated decisions, from the earliest cases upon the subject to the present time, not to reverse the judgment of the District Court refusing a new trial, unless some principle of law has been violated, misconceived or disregarded, to the prejudice of the party, or there is good reason to apprehend that injustice had been done, in refusing the application. Though the District Court, in its discretion, upon the application of the accused, might have granted a new trial, if, from the evidence and circumstances of the case, as they were apparent to the presiding judge, in his opinion, the ends of substantial justice required it."

As said by Judge Davidson in Gordon v. State, 29 Texas Crim. App., 410: "Nothing will be indulged in favor of such matters (purported affidavits) when they operate as an attack upon the judgment of a court of record, to the end that the judgment may be set aside or vacated on appeal. Every presumption must and will be indulged by appellate courts, tending to uphold and sustain judgments of trial courts. A party attacking such judgments must make it apparent that sufficient error exists to set aside or annul them." See also Morrison v. State, 39 Texas Crim. Rep., 519; Shutt v. State, 71 S. W. Rep., 18; cited, stated and quoted in said Hicks case, supra.

In Atchinson v. Bartholow, 4 Kan., 124; Thompson v. Higginbotham, 18 Kan., 42; Morgan v. Boord, etc., 9 Nev., 360; People v. Williams, 24 Cal., 31; People v. Tarm Poi, 86 Cal., 225; State v. Stucker, 58 Iowa, 496; Stanley v. Sutherland, 54 Ind., 339; Andrews v. State, 33 Ohio Cir. Ct. R., 564, it was held that affidavits must be positive, and when made on information and belief is wholly insufficient and should not be considered.

Our law prescribes (art. 714, C. C. P.), and it was administered to the jury in this case, this oath: "You, and each of you, solemnly swear that in the case of the State of Texas against Harry Calyon, the defendant, you will a true verdict render according to the law and the evidence, so help me God."

In this case the court expressly told the jury, after telling them they were the exclusive judges of the credibility of the witnesses and the weight to be given their testimony "you are bound to receive the law from the court and be governed thereby." In addition, he told them "the failure of the defendant to testify shall not be taken as a circumstance against him, nor shall the same be alluded to or commented on by you in your retirement."

No doubt each and every juror in this case was fully and completely tested on his voir dire before he was taken, and they each were wholly disinterested, entirely impartial and fair, and without any prejudice or bias against appellant. It is no light thing to treat the jurors as violating their solemn oaths. When it is attempted to be done by an accused after conviction, certainly something more than a mere purported affidavit by one of appellant's attorneys to the effect that "to the best of my knowledge, information and belief, the jury or some members thereof, commented upon the failure of the defendant to testify, and his failure

to place character witnesses upon the stand, and considered said matters," should be required to authorize the trial judge to summon them before him and answer to any such charge. They were not on trial. The accused was.

Let us further consider the purported affidavit of Mr. King, one of appellant's attorneys. It is simply and solely to this effect: "to the best of my knowledge, information and belief, the jury or some of them, commented upon the failure of the defendant to testify, and upon his failure to place character witnesses upon the stand in his own behalf and considered such failure to testify and to place such witnesses on the stand, in arriving at their verdict." This states no positive material fact whatever. He in no way stated he had any *knowledge* on the subject. When the trial judge heard the motion and the evidence thereon, it was shown that Mr. King had *no knowledge* whatever. It did not state his *information* "to the best of my information," states no material fact of even *information*. Nor did he state who his informant was, nor the information given him. Nor did he state why he did not attach an affidavit of his informant, nor that his informant refused to make an affidavit. When the trial judge heard the motion and evidence thereon, Mr. King swore only: "that he had prepared section 8 of the defendant's motion for new trial upon information communicated to him by Mr. R. L. Pillow, Jr., of counsel for the defendant, and that he made his affidavit thereto based upon such information so received"—simply that and nothing more. On that same hearing said Mr. Pillow swore only: "that he had talked to one of the jurors who tried this case, and that he had, after such conversation, furnished the counsel, Mr. King, who prepared and swore to the amended motion for new trial now on file in this cause, information concerning what had transpired between him, the said Pillow, and the said juror; and that he had truthfully passed the information received from the juror to his co-counsel, Mr. King"—simply that and nothing more.

We are impressed to ask, why did not Mr. Pillow himself instead of Mr. King, make the purported affidavit "to the best of *his* knowledge, information and belief"? But he did not do so. Nor did he on said hearing even tell the trial judge who the juror was who "talked" to him, nor what the "information received from the juror" was, nor why he did not get the affidavit of said juror what this "information" was. This "talk" of the juror with him was on or before November 11th. The hearing on the motion was had November 14th, three days later. There can be no doubt most, if not all the jurors, in this case, lived in the City of Galveston, and each and all of them could have been seen and "talked" to by one or the other, or both of appellant's attorneys, or appellant himself, and that if there had been any foundation, in fact, for such an attack on their verdict, some or all of them would have made an affidavit to that effect. Or, at least, appellant or one of his attorneys could have shown they applied to them for an affidavit and they refused to make one. The statute says, "it shall be competent to prove such misconduct by the voluntary affidavit of a juror." Surely the slightest

diligence of appellant and his attorneys would be to call upon the jurors for such an affidavit, and at least give them a chance to make or refuse to make one. They are not, in the first instance, as in this case was sought, to be jerked up by the process of the court "placed under the rule and that they be examined by these counsel (Mr. King and Mr. Pillow), in open court under oath singly as to the matters in this Section 8 of this motion."

If such purported affidavit and what is disclosed by the record on that subject in this case should be held to require a trial judge to summon the jurors and require them to be subjected to the said treatment, then, as we said in the Hicks case, supra: "what a flood-gate of mere 'fishing' with a drag-net would be turned loose. Verdicts and judgments of the lower court, if such were the case, would be mere farces. The trial courts would be converted into courts for the trial of the jury and not of an accused." And see further said opinion on this subject, 171 S. W. Rep., 766, which is applicable to this case.'

This case was tried before that eminent, learned and just judge, Robt. G. Street. He doubtless personally knew each and all of the jurors; he heard the whole trial, saw and heard all the witnesses, saw the maneuvers of the appellant and his attorneys and knew that the appellant had received a fair and impartial trial, and under all the facts and circumstances, exercised that proper judgment committed to him, and as there was no basis for attacking the jurors as having violated their oaths, properly overruled the motion for new trial.

3. The trial judge, in charging the jury, as a preliminary statement, among other things, defined rape generally as prescribed by article 1063, Penal Code, and included in such definition threats as included therein and in article 1065, but when he submitted the case to the jury for a finding he submitted it exclusively as based on force and did not submit it, on anything about threats. While it would have been proper for him to have left off as the definition of rape, rape by threats, it has all the time been held by this court that when he submits to the jury for a finding only the offense authorized by the indictment, statute and the evidence, no reversible error is committed. Railsback v. State, 53 Texas Crim. Rep., 542; Reynolds v. State, 58 Texas Crim. Rep., 273; Jordan v. State, 60 Texas Crim. Rep., 178; Keeton v. State, 59 Texas Crim. Rep., 316; Matthews v. State, 71 Texas Crim. Rep., 374, 160 S. W. Rep., 1185. Therefore, appellant's objections to the charge of the court on that ground presents no error.

4. Appellant's other objections to the charge of the court present no error and are too general to be considered. They are to the effect: (1) The court in the main charge failed and refused to apply the law to the facts of the case as developed by the testimony; (2) that the court in the main charge, nowhere charged the jury upon any affirmative defense developed by the testimony; (3) that the only place in the court's main charge authorizing an acquittal is "otherwise you will find the defendant not guilty."

In our opinion the court's charge does apply the law to the facts

developed and the charge is apt, states the law applicable to the facts of the case and is not subject to any of these objections. Besides this, the court gave all of appellant's special charges requested, except one which was to peremptorily acquit, and another, because it was embraced in the court's main charge, and it was so embraced. So that if there was any omission of any issue in the court's main charge, it was fully covered by the special charges given at appellant's request.

His charge No. 2 is: "If you believe from the evidence in this case that the prosecutrix and the defendant went away on the creek together for the purpose on the part of each of them of engaging in sexual intercourse and that while engaged in said act, or while preparatory to such act, they were come upon by some third person and that thereupon the prosecutrix for the first time offered resistance to the efforts of the defendant to consummate the act of sexual intercourse and she, the prosecutrix, jerked or pulled away from the embrace or hold of the defendant and ran screaming from the scene of the act, or if you entertain from the evidence a reasonable doubt as to the existence of this state of facts, you will acquit the defendant and say by your verdict, 'Not guilty.' "

And his charge No. 3, as follows: "If you believe from the evidence submitted to you on the trial of this case that the prosecutrix, Leta Tinnin, at any time after she met the defendant consented to have sexual intercourse with him on the day alleged in the indictment and that thereafter the defendant with her consent was attempting to carry out the proposition so previously consented to by her and they were discovered in the act and the defendant thwarted by third parties from carrying out the act of sexual intercourse. Or if you have a reasonable doubt as to whether or not these facts existed at the time of the alleged crime, then you will acquit the defendant and say by your verdict 'Not guilty.' "

And his charge No. 4, as follows: "If you believe from the evidence in this case that the prosecutrix and the defendant left the dance pavilion at Thayman Park on the date alleged in the indictment and went for a stroll down the creek; that after reaching a distance of about 100 yards from the dance pavilion the defendant and the prosecutrix sat down together on the ground for the purpose of conversation and to while away the time, and that while sitting there the defendant attempted to kiss the prosecutrix and at the time put his hands on her breast and on her leg in an effort to merely fondle her person, and that although there for several minutes he never at any time pulled or attempted to pull her dress over her head and never at any time made any effort to have sexual intercourse with the said prosecutrix, then and in that event you will acquit the defendant and say by your verdict, 'Not guilty,' and if you have a reasonable doubt as to whether or not this is what happened you will acquit the defendant. This even though you may believe that the defendant had no right to fondle the person of the prosecutrix or even though you believe that in fondling her person it was without her consent."

5. At first the court permitted Mr. and Mrs. Tinnin, the father and

mother of the girl, to testify as to the condition of her dress and appearance when she reached home after the assault, which was about two hours after the assault. This evidence was clearly admissible under all of the authorities. Pefferling v. State, 40 Texas, 487; Lawson v. State, 17 Texas Crim. App., 292; Roberson v. State, 49 S. W. Rep., 398; Lights v. State, 21 Texas Crim. App., 308; Grimmett v. State, 22 Texas Crim. App., 36; Conger v. State, 63 Texas Crim. Rep., 312; Sharp v. State, 68 Texas Crim. Rep., 93, 160 S. W. Rep., 369, and many other cases. The length of time after the alleged assault goes to the weight and not the admissibility of the evidence. Besides, the court excluded this evidence expressly by his charge. Miller v. State, 31 Texas Crim. Rep., 609; Martoni v. State, 74 Texas Crim. Rep., 90, 167 S. W. Rep., 349.

The record presents no reversible error and the judgment will be affirmed.

*Affirmed.*

DAVIDSON, JUDGE.—I can not concur and may write on one or more of the questions mentioned in the opinion.

DAVIDSON, JUDGE (dissenting).—Appellant was convicted of assault to rape. I deem it unnecessary to go into a statement of the case on the facts, though I do not believe the statement of the evidence as set out in the original opinion is as clear and full as it should be, and in some respects is not, I think, in consonance with the record.

I more than seriously question the sufficiency of the evidence to support this conviction. It is shown on the motion for new trial appellant raised the issue of misconduct of the jury. This motion was set down for hearing by the court, and appellant asked that the jurors be summoned to testify. The matter set out in the motion for new trial was, the jury commented in their retirement on the failure of the defendant to testify in his own behalf, and also to place character witnesses upon the stand in his own behalf, and that they considered such failure to testify as well as the failure to place the witnesses on the stand in regard to his character. This is signed by counsel, and sworn to by one of the counsel on information and belief. Process was asked for the jurors to be brought into court, which the trial judge promptly and peremptorily refused to grant. My brethren affirm, holding these matters are not error. The statute provides, among other things, the court shall grant a new trial upon misconduct of the jury. Of course, it must in some way be material to or affect the verdict of the jury, or probably did. A comment on the failure of the defendant to testify is reversible error. It having occurred in the jury room, could not be raised except on motion for new trial. The further fact that the jury commented on the failure of the defendant to produce character witnesses is also reversible. The State would not have been permitted to introduce before the jury evidence of the failure of the defendant to testify or to produce character witnesses. It is provided by the statute also that it is *"competent"*

to show this by the affidavits of the jurors, in support of this motion. This was not done in this case, but it was called to the attention of the court under oath by one of the attorneys of appellant that he had information and believed the information to be correct, that these matters had occurred. Upon this showing the court ought to have issued the process at the request of the defendant for the jurors and had them before the court. The statute provides, article 841, Revised Code of Criminal Procedure, 1911, as follows: "The State may take issue with the defendant upon the truth of the causes set forth in the motion for new trial, and in such case the judge shall hear evidence by affidavits or otherwise and determine the issue." It will be seen that it is not necessary that the affidavit of the jurors be filed, but in fact under the statute it is not required that an affidavit be filed at all in regard to this matter. The court may hear this evidence otherwise than by affidavit, and it has been, until the recent case of Hicks v. State, and the instant case, the rule that the trial court could hear it either way as the statute provided. This was so held in Richardson v. State, 28 Texas Crim. App., 216, and Kelley v. State, 31 Texas Crim. Rep., 211. It was, in substance, also held in Maples v. State, 60 Texas Crim. Rep., 169, and in Patterson v. State, 63 Texas Crim. Rep., 297. The writer wrote the opinion in the Maples case, and Presiding Judge Prendergast wrote the opinion in the Patterson case, and quoted at length from the Maples case, citing it as authority. In the Maples case it is shown that one of the counsel in the case took the affidavits that were filed. Following the line of authorities cited in the opinion, the court held that these were illegal and could not be considered. That has been the rule in Texas in its history. After so holding and the affidavits passed out of the case, then this language was used: "We would not reverse this case alone upon this proposition for the reason that the jurors were brought into court and testified; but, to prevent the happening of this matter in future trials, we have taken it up and decided it. (This has reference to illegal affidavits above mentioned.) Under our statute the court may decide a motion for new trial on contested issues by means of affidavits or by hearing testimony. Of course, the affidavits mentioned in the statute means such as can be legally taken. An affidavit taken by a party not authorized to administer oaths in the particular transaction would not constitute a legal affidavit, and, therefore, not the basis of testimony on objection." This was quoted and cited by Presiding Judge Prendergast in his opinion in the Patterson case, supra.

From the Richardson case, supra, I make this quotation: "We are not satisfied even as to the propriety of a judge privately seeking information as to a matter of fact pending before him for decision. Such statements are hearsay, and are not legitimate evidence. His decision on the motion for new trial should be based upon *the evidence he has heard by affidavit or otherwise*. Code Crim. Proc., art. 781, supra. It must be *evidence* testified or sworn to on the hearing before him, and where the witness' statements, credibility, and means of knowledge can be fully and legally ascertained. Ex parte, independent, and unsworn

statements should not be allowed to override a defendant's sworn statement. The judge might, if he deemed proper, have called Crane's father to the stand if he knew or had any reason to believe that said Crane knew facts important and pertinent to the issue, and thereby have given defendant a right to subject him and his statements to the legal tests applied generally to witnesses and their evidence, if he had so desired."

In Kelley's case, supra, the court said: "The State filed no controverting affidavit contesting this issue, but the court heard evidence in relation thereto without such controverting affidavit. This action of the court, it is contended, is erroneous. We do not think so; first, because the testimony was not newly discovered, and this was manifest from the affidavit; and, secondly, because the court is authorized to hear evidence without such controverting affidavit. Willson Crim. Stats., secs. 2552, 2554."

The statute does not prescribe a rule which excludes all testimony except that by affidavit. Affidavits may be filed, and the court may try the question on motion for new trial on the affidavits, but this is not the only rule, for the statute expressly provides it may be done "otherwise." The word "otherwise" opens up any avenue that is legal for the court to determine the question by hearing evidence. It may be by witnesses or affidavit, but it may be by record evidence. There are many ways by which proof is reached through the evidence, and any character of testimony that proves the issue is admissible, or whether it proves it or not; if it sustains or tends to sustain the issue, it is admissible. To say that the issues on motion for new trial, on account of the misconduct of the jury, shall be tried only upon affidavit or when supported by affidavit, is a clear infringement and overruling of the statute and plainly sets at naught the express procedure provided by the Legislature. In fact, the court, in the opinion cited, indicates that perhaps the better and safer rule would be to have the witnesses before the court that he may look at them, hear them and know whether they are telling the truth or not. This could not be done if tried only upon affidavits,—not only so, but wherever an issue is to be tried the Constitution, article 1, section 10, expressly provides that the defendant shall have compulsory process for his witnesses. In this instance he applied for process for the witnesses, and the court peremptorily refused to grant it. There was no way for him to get the matter before the court except by order of the court, unless, of course, the witnesses should voluntarily come, but they did not appear. I suppose the trial judge proceeded upon the theory that a juror would not be permitted to attack his verdict. Whether that was the holding or not it is unnecessary here to discuss. If it was, then the statute expressly set aside and abrogated that rule when it provided it was "competent" to use the affidavit of a juror to show misconduct of any one or more of that body. We have another rule in our statute which has been accorded high standing by the majority of this court on more than one occasion, that is, that the provisions of the Code of Criminal Procedure shall be liberally construed to obtain the objects and

purposes of the Code of Criminal Procedure. This they seem to have applied very liberally for the State, but very critically and harshly against the defendant. The statute above referred to did not apply for the State exclusively, but it applied generally to the procedure and practice prescribed by the Legislature. Instead of giving this anything like a liberal or even a fair construction, my brethren held that in the face of the statute which provides that these issues may be tried by affidavits or otherwise, that they can only be decided by affidavit. This seems to be out of harmony with the jurisprudence of the State as laid down in opinions already cited as well as by the statute itself. I do not care to follow this matter further. The defendant was clearly entitled to have those matters investigated by the court, and if the jurors would so testify he should have been awarded a new trial not only on their comment on the failure of the defendant to testify, but also on the fact which they used against him that he did not produce character witnesses. I wrote to some extent in a dissent in the Hicks case, and I write this in addition to what I there wrote. These are some of the reasons why I file this dissent.

March 10, 1915.

PRENDERGAST, PRESIDING JUDGE (additional opinion).—The original opinion herein, and the record, were turned over to Judge Davidson at his suggestion, on January 26, 1915, for investigation and examination. The next day he turned them over to the clerk for the opinion to be handed down with this endorsement on the opinion, "Davidson, Judge, dissents," and with this at the foot of the opinion, "I can not concur, and may write on one or more of the questions mentioned in the opinion. Davidson, Judge,"—all written by him. On February 15, 1915, he filed his dissenting opinion. Neither of us saw or knew it until one of the stenographers thereafter called our attention thereto.

To his opening statement, "I deem it unnecessary to go into a statement of the case on the facts, though I do not believe the statement of the evidence as set out in the original opinion is as clear and full as it should be, and in some respects is not, I think, in consonance with the record," we have to say: Although he took the record and original opinion for investigation and examination before the opinion was handed down, as stated, he in no way, and at no time, before the original opinion was announced and handed down, complained, suggested or intimated to us, that the statement of the evidence in the original opinion was not clear or full, nor that it was not "in consonance with the record." He was present when the original opinion was handed down in open court. It occurs to us if any of his complaints *now* made had had the slightest merit, he would *then* in some way, have called our attention thereto. If he had, and there had been any error by us of either omission or commission, we would gladly have corrected it. Appellant filed no motion for rehearing making such complaint, nor does Judge David-

son attempt to point out any. The statement we made was "as clear and full" as could be made from the evidence in the record. In no particular was any statement made by us which is not "in consonance with the record." Every statement by us, in every respect, is strictly and fully "in consonance with the record."

To his next statement, "I more than seriously question the sufficiency of the evidence to support this conviction," we have nothing to say, except that a jury of twelve competent, fair, impartial and disinterested men, after hearing all the witnesses and seeing their manner of testifying and hearing full argument by the attorneys for both sides, upon their solemn oaths, said appellant was guilty "beyond a reasonable doubt," and a learned, fair, impartial and just trial judge, who also heard all, also so said. We reached the same conclusion from a careful study of the whole record.

In the remainder of his opinion, Judge Davidson criticised us for not reversing this case because the trial judge refused to summon the jurors and require "that they be placed under the rule and that they be examined by these counsel in open court under oath singly" as to whether or not they had violated their oaths and were guilty of some misconduct in "trying this case," on the bare statement by appellant's attorneys in their motion for new trial, in effect, not sworn to by anyone, "that said jury or some member thereof" *might* have violated his oath.

Judge Davidson contends in his opinion, that as article 841, Code of Criminal Procedure, says, "the State may take issue with the defendant upon the truth of the causes set forth in the motion for new trial, and in such case the judge shall hear evidence by affidavit or otherwise, and determine the issue," that therefore the judge is not restricted to affidavits but can hear evidence "otherwise" also. Certainly this is true, and we did not hold in this case, nor in the Hicks case (171 S. W. Rep., 755), nor in any other case, that this could not be done. Nor can our opinion in this case, the Hicks case, or any other, be tortured into holding that it could not be.

In order to make the point clear in the Hicks case, in the original opinion, we quoted what the trial judge stated as the reason he refused to have the jurors who were present sworn and testify, in a separate paragraph, as follows: "No issue as to the misconduct of the jury having been submitted to the court, the jury was not permitted to be sworn and impeach its verdict which appeared not impartial or unfair under all the facts of the case" (171 S. W. Rep., 757), and applying what the judge so said to the facts on that question, we specifically stated: "The said ground of the motion for new trial was not sworn to by appellant or anyone else, and was not supported by the independent affidavit of anyone whomsoever." (P. 757.) We then cited and quoted what Judge Harper said in Bryant v. State, 65 Texas Crim. Rep., 456, 153 S. W. Rep., 1156, as follows: "It has always been held, that when matters extrinsic the record are sought to be raised in the motion for new trial, such grounds should be verified by the affidavit of appellant." Then in the opinion on rehearing in that Bryant case, in answer to appellant's

complaint that he had failed to find any such case, Judge Harper said: "If he will read Barber v. State, 35 Texas Crim. Rep., 70, 31 S. W. Rep., 649, he will find a case so holding, and this has always been the rule." Judge Davidson himself wrote the opinion in said Barber case, and said: "The motion for new trial is not sworn to, nor does the affidavit of appellant, or his counsel, accompany the motion. This is in no sense a compliance with the law. . . ." Judge Davidson was present and participated in and agreed to Judge Harper's opinion in said Bryant case, both in the original opinion and that on rehearing.

Again, in the Hicks case in the opinion on rehearing, we demonstrated that the only question we were considering, or discussing, or deciding on that point, was that in order to require the lower court to hear evidence, at all, whether by affidavit or otherwise, it was absolutely essential for the motion for new trial attacking the verdict on any ground dehors the record, to be sworn to. After citing and quoting authorities clearly and distinctly so establishing, in a separate paragraph, we said:

"We think there can be no sort of doubt but that these authorities establish beyond question, that in order for appellant to have had considered his ground of motion attacking the verdict of the jury on any matter extrinsic the record itself, *as a matter of pleading,* he must support it by his own affidavit, or the affidavit of someone else specifically showing the truth of the grounds of attack. *And when it is not so sworn to or supported, it presents no question requiring the lower court* to consider or investigate it." (171 S. W. Rep., p. 763.)

Again, in our opinion in this case, we distinctly state: "The basis of the holding of this court in that case (Hicks) was, that the court properly refused to hear the jurors and have them testify, although in actual attendance for that purpose, *because the attempted pleading in the motion averring said misconduct of the jury was not sworn to by the appellant or anyone for him.*"

All this is made so plain, clear and simple in all said opinions, that he who runs may read and not err therein. So that anyone can see that when Judge Davidson in his dissenting opinion herein says: "The court may hear this evidence 'otherwise' than by affidavit, and it has been, until the recent case of Hicks v. State, and the instant case, the rule that the trial court could hear it either way, as the statute provided," and all else he says on that subject, is wholly uncalled for and has no application whatever to what we said or decided in either this or the Hicks case.

It is perfectly evident from a casual or careful reading of his opinion, he wholly misconceived the question. We discussed and decided the *requisites of a proper pleading to admit any evidence whatever,* whether by affidavit or "otherwise," or by both affidavit *and* otherwise, and nothing else. He does not discuss that question at all, but does discuss the character of evidence which would be admissible when the proper pleading had been filed.

His animadversions upon us in his dissenting opinion, wherein he says we have given high standing on more than one occasion to the rule

of our procedure statute requiring that it shall be liberally construed, and that we "seem to have applied (that rule) very liberally for the State, but very critically and harshly against the defendant," calls for some attention on our part. He evidently refers to our holding in this case that the ground of the motion herein attacking the jury for misconduct was not so sworn to as to properly require the judge to have the jury summoned, sworn, etc.

We will let him answer himself, in this respect, by one of his own recent decisions. We refer to Hampton v. State, 63 Texas Crim. Rep., 100. He wrote the opinion in that case June 23, 1911, a few months after our accession to this court.

The official report of that case does not state what the fourth ground of the motion for new trial was, nor did Judge Davidson state what it was in his opinion holding it "is not verified in any way and can not be considered other than generally it 'alleges misconduct' of the jury." The papers in that case have at all times since then been on file in this court and now are. We have procured them and will state fully and quote literally said fourth ground and the "swear at it" by the appellant therein. In order to make clear the reference in said fourth to these words, "in connection with the foregoing," we will state the substance of the third ground which is evidently what is referred to by said words.

. Hampton made a motion for new trial. In his third ground he complained of the judge's refusal to withdraw from the jury the district attorney's closing argument wherein he pointed at, and referred to defendant as "this bully" in connection with his remarks that defendant had come eight miles to the picnic, unlawfully carrying a pistol, with murder in his heart and was looking for trouble. Then his fourth ground was:

"4. In connection with the foregoing, defendant would show further that while the jury was deliberating upon its verdict, and before the verdict was reached, several members of the jury discussed the character and reputation of defendant; several of said jurors remarked that he, the defendant, was a mean looking negro; that he had the appearance of being a bully, and inquired of one of the jurors, who knew the defendant and lived in the same section of the county, whether or not the defendant was a gambler, a crap shooter and a bully, to which said juror replied, in the presence and hearing of other jurors, that he knew nothing personally about the facts inquired about, but that he had heard that defendant was a gambler and crap shooter, and defendant would show that such conduct of the jury was calculated to and did prejudice the defendant in the minds of the jurors, and that thereby defendant did not receive a fair and impartial trial. Defendant would further show that his character was not put in issue in the case." This motion was signed by his attorneys, J. S. McIlwaine and Sawnie Robertson. It was then sworn "at" by Hampton, as follows:

"Dock Hampton, defendant, being duly sworn, says on oath that the

matters and facts set forth in paragraph 4 of the above and foregoing motion are true to the best of his knowledge and belief.

> "Dock Hampton, Defendant.

"Subscribed and sworn to before me this the 15th day of October, 1910.

> "Pat H. Beaird,

(Seal)     "Clerk of the District Court, Smith County, Texas."

Judge Davidson based his opinion on that point solely on the insufficiency of the motion and swear at it, and held: "The fourth ground of the motion for new trial alleges misconduct of the jury in their retirement in reaching their verdict. *This is not verified in any way and can not be considered.*" (Italics ours.)

A mere casual, or a most careful, reading and comparison of this and the Hampton case will show they can not be distinguished. Comment is unnecessary.

Our original opinion in the Hicks case was handed down November 26, 1913. Within fifteen days thereafter Hicks made a motion for rehearing. We held the case under consideration a long time under this motion, expecting Judge Davidson would write his dissenting opinion therein so that we could have the benefit of it. But finding he would not write it, on March 4, 1914, we handed down the opinion on rehearing. Judge Davidson did not file his dissenting opinion therein until December 21, 1914, thereby withholding the opinion from publication till the issue of January 20, 1915, of the advance sheets of the Southwestern Reporter. A reading of it, and our opinion therein will demonstrate he clearly misconceived the question in that, as well as in this, case. We have written this paragraph about the Hicks case because Judge Davidson added as a tail to his dissent herein this: "I wrote to some extent in a dissent in the Hicks case, and I write this in addition to what I there wrote."

Evidently he could find no case or authority to back his dissent from November 26, 1913, when the original opinion was rendered, till December 21, 1914,—one year and nearly one month,—when he filed his dissenting opinion therein, nor since then to February 15, 1915, when he filed his dissent herein,—an additional time of nearly one year and two months, for none of the cases or statute cited by him are in point to support his dissent.

DAVIDSON, JUDGE (dissenting).—With some degree of regret I feel called upon to make a few remarks in reply to Judge Prendergast's *"Additional Opinion."*

Judge Prendergast refers to two cases in which I had the honor to write the opinions, Barber v. State, 35 Texas Crim. Rep., 70, and Hampton v. State, 63 Texas Crim. Rep., 100. The correctness of those opinions I think hardly debatable, and their inapplicability to this case is also beyond question. In the Barber case there was a motion made for a new trial, unsupported by affidavit or offer to adduce testimony, on

Vol. 76 Crim.-8

the ground of newly discovered testimony, and there was nothing brought to the attention of the court by which the court was informed of the newly discovered testimony except a mere statement in the motion for new trial.    There was no offer by the defendant to support this by testimony, and no evidence offered to that effect, and besides it is stated in the opinion itself on page 73 of the volume cited, that the alleged newly discovered testimony was simply impeaching evidence.    White's Ann. C. C. P., p. 757, sub. 8, for cases.    All lawyers understand that impeaching evidence is not usually within the rule of newly discovered testimony, and does not usually authorize granting a new trial.    In the Hampton case, supra, there was no attempt at verification of the allegation in the motion for new trial of the misconduct on the part of the jury, nor was there any offer to produce any evidence in support of the motion.    The matter was presented merely as a ground of the motion. There was no request for process for witnesses.    In this case an affidavit was filed by counsel.    The affidavit was based upon information and belief that the misconduct occurred.    I state it generally, without detail.    On this affidavit of information and belief of the affiant request was made of the court for process to bring jurors to verify the statements made in regard to misconduct of the jury; at least it was sought to obtain their testimony to so prove.    This the trial court refused.    The Hampton case or the Barber case can not be authority in the instant case, especially as the statute provides the grounds of the motion can be heard by the court on "affidavit or otherwise."    It was undertaken to get the jurors before the court to hear the testimony in regard to the misconduct of the jury, based on the affidavit of counsel in the case, which was refused.    In the Barber and Hampton cases, supra, there was no affidavit made by anybody and no attempt in any way to get evidence before the court.    In both cases the matter was left alone on the simple statement as a ground of the motion for new trial.

I do not, of course, believe in this case an affidavit was necessary. The jurors could as well have been brought before the court, and ought to have been produced.    The affidavit on information and belief certainly ought to be legally sufficient basis for process for witnesses.    Such affidavit can be and is basis for a criminal prosecution under the statute. Penal Code, 1911, art. 269, sub. 2, and note for cases.    Certainly if the trial and conviction of the citizen can be had on affidavit, based on information and belief, etc., it ought to be amply sufficient to bring witnesses to prove accused has not had a fair and impartial trial.    The accused shall have compulsory process for obtaining witnesses in his favor.    Const., art. 1, sec. 10.    The legality of his conviction was directly put in issue and he refused testimony to prove it.

I would not have filed this in reply to Judge Prendergast's "*Additional Opinion*" except for the fact that the two cases he cites have not been fairly construed or treated.