

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-13-00469-CV

KEITH B. ALEXANDER                                                    APPELLANT

V.

EDDIE KENT                                                            APPELLEE

----------

## FROM THE 141ST DISTRICT COURT OF TARRANT COUNTY
## TRIAL COURT NO. 141-225394-07

----------

## OPINION

----------

Eddie Kent sued K.B. Alexander Co. of Texas, Inc. (KBA) and Keith B. Alexander (Alexander), individually, for breach of contract and fraud in the course of performance by KBA of a contract for construction of a car lot. Kent alleged KBA and Alexander obtained progress payments from Kent based upon false payment applications misrepresenting that subcontractors had been paid for their work on the project when they had not. When KBA declared bankruptcy, Kent

nonsuited KBA and proceeded on his fraud claim against Alexander, individually. After a bench trial, the trial court rendered judgment in favor of Kent for fraud against Alexander, awarded Kent $20,061.32 in actual damages and $25,249.97 in attorney's fees, and made findings of fact and conclusions of law to support the judgment. Alexander appeals from the judgment against him.

Alexander presents seven issues, contending that (1) the pay applications' verbiage did not constitute fraudulent representations; (2) Kent's equal access to subcontractor information is fatal to his claim; (3) Kent did not justifiably rely on the pay applications; (4) Kent produced no evidence that Alexander intended at the outset of the contract not to perform; (5) the pay applications were not signed by Alexander, individually, precluding individual fraud liability; (6) there is legally and factually insufficient evidence to support the attorney's fees awarded to Kent; and (7) there is factually insufficient evidence to support the damages award. We affirm in part and reverse and render in part.

## BACKGROUND

Alexander was president and sole stockholder of KBA, a construction company. In 2006, Kent obtained bids from several contractors and chose KBA as general contractor to construct a car lot and an office building for his used car business, "Easy Ed's Autos." KBA agreed to build a 20,000-square-foot fenced concrete lot and an 800-square-foot building with a storefront.

2

*The Construction Contract*

By a written standard form construction contract entered into between the parties, KBA agreed to act as general contractor on the project and to provide all labor, materials, equipment, and services necessary to complete the work.[1] Whatever work KBA did not perform itself would be performed by subcontractors. The parties agreed on a "lump sum" contract price for the project of $383,871, which Kent would pay through a series of monthly progress payments. Article 9 of the contract set out the specific provisions regarding payment. KBA was to prepare a schedule of values apportioned to the various categories of the work, with the total of all values to equal the contract price. The schedule of values for Kent's project contained seventeen separate categories of work to be performed.

Each month, KBA was to submit an "application for payment" to Kent for payment of an amount that would be itemized and supported by KBA's schedule of values and any other substantiating data required by the contract. The total of the payments would equal the lump sum contract price. Kent agreed to pay the amount due on each payment application, less retainage, within ten days of receipt.

Under the terms of the contract, Kent had the right to require partial lien and claim waivers from KBA in the amount of the payment applications and

---

[1]The printed contract stated on the front page that it was produced from software under a grant of a license to subscribers of AGC Docubuilder software, was headed "The Associated General Contractors of America, AGC Document No. 200," and was entitled "Standard Form of Agreement and General Conditions Between Owner and Contractor (Where the Contract Price is a Lump Sum)."

affidavits from subcontractors and material suppliers for work that had been completed at that time as a prerequisite to payment. He also had the right to adjust or reject a payment application or nullify a previously approved application for any failure of KBA to properly pay subcontractors or material suppliers. If Kent made timely payments but a subcontractor filed a lien against Kent's property, KBA had thirty days to remove the lien, and if it failed to do so, Kent could remove the lien himself and recover his costs and expenses directly from KBA.

### The Applications for Payment

Beginning in September 2006 and continuing during the course of construction, KBA presented monthly applications for payment to Kent, each entitled "APPLICATION AND CERTIFICATE FOR PAYMENT," requesting payment for work completed at the time each application was presented. Alexander signed and swore to each application as "President" of KBA. Only the last three applications for payment are at issue in this case.[2] The first of the three applications at issue was dated November 20, 2006, represented that work had been completed totaling $228,563, less previous certificates of payment by Kent of $96,787, and requested payment from Kent of $120,346. The second application at issue, dated December 20, 2006, stated that work had been completed totaling $359,719, less previous certificates of payment by Kent

---

[2]While previous applications for payment were presented to and paid by Kent, those are not at issue.

totaling $217,133, and requested payment from Kent of $129,307. The third and final application for payment at issue was dated January 19, 2007, reflected that all work was 100 percent completed, and requested Kent to pay the balance of the contract price.

Each application submitted by KBA to Kent for payment was supported by an itemized schedule of values showing the percentage of work completed to that date for each of the categories of work listed on the schedule, the dollar amounts previously paid by KBA to subcontractors for their work completed, the total dollar amount of previous payment applications presented to and paid by Kent, and the dollar amount being charged to Kent for progress on the job since the previous payment application. Each application contained this certification:

> The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates of Payment were issued and payments received from Owner, and that current payment shown herein is now due.

Shari Riddle, KBA's project coordinator, kept the books and prepared the applications for payment. She would receive information about the work completed to date from pay applications (similar to the payment applications submitted by KBA to Kent) filled out by the subcontractors and submitted to KBA as to what work they had completed each month, as verified by KBA's project manager. She would input the information and create a payment application to be submitted by KBA to Kent. The payment applications were presented to the

5

architect to verify the percentage of work completed. She would then present the payment applications to Alexander, who would sign each payment application as "President" of KBA, and Riddle would notarize his signature on each application as "subscribed and sworn to" before her. Each application for payment would then be sent by KBA to Kent by fax or by delivery by a project manager for payment.

When Kent received each payment application, he took it to his bank and drew against his loan for the project and then wrote a check to KBA. He would take the check to KBA's office and go over the pay application with Riddle. He would ask her if it was correct and whether the subcontractors had been paid for work completed to the date of each application; Kent's testimony was undisputed that Riddle informed him on each occasion that the subcontractors had been paid. Kent made checks out to KBA, which were deposited into KBA's corporate operating account. Alexander did not dispute that Kent paid the amounts requested by each application for payment. Kent was satisfied with KBA's work on the project, and other than a screen and a crash gate, he had no complaints about the construction. He acknowledged that KBA and its subcontractors successfully completed the work with the exception of a few punch list items. Kent moved onto the newly constructed property after it was completed in January 2007.

### Unpaid Subcontractors

Shortly after Kent moved onto the property and opened for business, one of the subcontractors came to Kent's place of business and asked him if he had paid KBA. The subcontractor explained that he had not been paid for his work and said that Alexander had told him that he could not pay the subcontractor because Kent had not paid him. Concerned that a subcontractor had not been paid, Kent contacted Alexander and demanded identification of any subcontractors who were still owed payment by KBA for work on the project. Alexander responded, sending Kent a list of subcontractors to whom KBA still owed payment, to which Kent added two more, for a total of between $119,000 and $120,000 still owed to subcontractors on the project.

A total of nine subcontractors were still owed money at the end of the job, eight of which filed liens against Kent's property. Some of the unpaid subcontractors made claims against Kent. One subcontractor, who had been paid nothing, filed a civil suit against Kent and KBA, which Kent settled for fifty cents on the dollar. Kent settled with three other subcontractors who had not been paid by KBA or at least not paid in full, giving them cashier's checks and obtaining assignments and releases of their liens. Specifically, Kent paid $6,271.67 to Business Flooring Specialists, $9,413.65 to Ajax Glass, and $4,376 to Jerry's Cabinetry. Other liens were filed against Kent's property for nonpayment by KBA for subcontractors' work or materials, but he did not pursue them in this suit. The only actual damages that he sought to recover were the

7

amounts of the three cashier's checks to Business Flooring Specialists, Ajax Glass, and Jerry's Cabinetry, which totaled $20,061.32.

## THIS SUIT

Kent sued both KBA and Alexander, individually, for breach of contract and fraud. KBA filed for bankruptcy, and Kent nonsuited the company but continued his suit against Alexander, individually, based only on his cause of action for fraud. During trial, counsel for Kent argued in his opening statement and proceeded to put on evidence to show that the representations made by Alexander in the payment applications that subcontractors had been paid were false; that the false representations were made intentionally; that Kent justifiably relied on those misrepresentations, as well as Alexander's experience in the construction industry, in making the payments requested by the payment applications; and that he was damaged as a result by having to settle with and obtain releases of mechanic's and materialmen's liens filed against his property by subcontractors who had not been paid.

In his opening statement, counsel for Alexander stipulated that subcontractors were left unpaid but contended that KBA had other projects that just stopped and that other clients of KBA "went under," causing KBA to fail as the result of the economic downturn occurring during the period of Kent's construction project. He argued that the suit was a simple breach of contract case that Kent had turned into a vendetta against Alexander.

8

***Eddie Kent***

Kent testified it was his understanding that each payment application presented to him for payment each month certified that subcontractors had been paid in full for the work they had completed the previous month. He testified he relied upon those certifications in making payments and would not have made the payments to KBA as requested by the last three applications for payment had he known that subcontractors were not being paid. When he took a payment check to KBA, he would talk to Riddle and ask her if the amounts were correct and if the subcontractors had been paid, and she would assure Kent they had been paid. Kent further said when he learned that the architect offered a service to verify that payments had been made to the subcontractors, he consulted Alexander about it, but Alexander told him that the architect's service would be a waste of money, that Alexander himself "would see that everybody got paid," and that Kent need not have that sort of due diligence done.

As an example of how the schedules showing the work completed and payments made to subcontractors attached to the payment applications were false, Kent testified the figures in the schedule attached to the November 2006 pay application misrepresented that Jimmy Sanders, who owned General Building and Erections, had been paid $12,610, misrepresented that $23,066 had been paid for plumbing and storm drainage, and misrepresented that $27,072 had been paid for electrical work. Kent testified he hired and paid attorneys to consider putting KBA in bankruptcy in an effort to get the subcontractors' unpaid

9

bills paid, but the owner of Ajax Glass persuaded him not to. Instead, Kent settled with the unpaid subcontractors for fifty cents on the dollar and obtained assignments of their liens against his property.

### Shari Riddle

Riddle, who no longer worked for KBA, testified and explained that every subcontractor filled out a form for the work they had completed during each month, which was verified by the project manager and given to her for invoicing. She did not check to see if the information was correct. Her job in preparing payment applications did not include checking to see who had been paid; she said that was Alexander's duty. She explained that the amounts shown each month in the column entitled "Previous Applications" in the schedule of values attached to each payment application were not necessarily the amounts KBA paid to each subcontractor for their work because those amounts included overhead and profit. She would input the data she was given and the software program would "spit out" the applications for payment owed by the owner based on the percentage of work completed. She further testified that Alexander was the only person authorized to write checks for KBA.

### Keith Alexander

Called as an adverse witness, Alexander acknowledged that he represented that he had paid the subcontractors as stated in each of the certifications in the payment applications presented to Kent. He further acknowledged that the construction contract put the responsibility for payment of

10

liens on KBA, that liens were filed against Kent's property on the project, and that KBA was not able to satisfy all of them.

As to who at KBA specifically had responsibility to see that payments to subcontractors were made, Alexander testified that at the time of Kent's project, his company had a bookkeeper and project managers who would approve the subcontractor payouts. But they would not necessarily report to him that payouts had been made because their focus was on the percentage of completion of the job. Likewise, the architect would verify that the amount of work completed matched up with the percentage of completion but verifying that payments to subcontractors had been made for their work was not the architect's responsibility; it was KBA's office's duty.

Alexander admitted that he did not review anything before signing the December 20, 2006 payment application but relied on "the folks at the office." He had no idea whether the information was true and correct. They had multiple projects going at one time. His main job at the corporation was to try to get new business and crisis management. If Riddle put a document in front of him to sign, he "just signed it."

Alexander agreed the final payment application dated January 19, 2007, represented that the job was done, except for the five percent retainage, and it requested payment by Kent of the balance owed under the contract of $38,210, which Kent paid. Alexander acknowledged that, as with the previous applications for payment submitted to Kent, Riddle just handed the application to Alexander,

11

he signed it, and she notarized it. He explained that KBA's procedure for the end of a month was to gather up all of the payouts to be submitted to the owners and give them to him for his signature. Nevertheless, it was his belief that when he signed each pay application, each was true and correct.

As to how applications for progress payments were presented to owners, Alexander recalled that payment applications were first sent to the architect for his review and verification of percentage of completion and then delivered to the owner by fax, by a project manager, or sometimes by himself. He did not remember exactly. When Alexander was asked whether he explained to Kent at any time that all of the subcontractors had not been paid, he acknowledged that he thought that discussion about subcontractors being owed "was later on in the job" when Kent requested the list of subcontractors to whom balances were still owed. That answer was consistent with Kent's testimony that he did not learn of any subcontractor not having been paid until one of them came to see him after the project was completed, after he had made his last payment of the balance owed on the contract, and after he had moved onto the property and opened for business. Alexander did not recall when Kent knew that subcontractors were owed or on what timeline.

Alexander knew generally that subcontractors had only a limited amount of time—ten to fifteen days after their work was done—to send notification of any nonpayment by the general contractor to the property owner and thirty days after that to file a lien and that material suppliers had a similarly limited period of time

after delivery of materials to give notification and then file a lien. He knew that it was important for a subcontractor to file a lien quickly and that if a lien was not timely filed, the subcontractor could not collect on his lien.

***Subcontractors' claims***

Kent offered into evidence a copy of a petition filed in a suit by Jerry's Cabinetry against him and KBA for work Jerry's Cabinetry had done on Kent's construction project. Alexander admitted Jerry's Cabinetry had not been paid. Counsel for Alexander objected to the admission of the petition into evidence, stating that Alexander was stipulating that there were unpaid invoices to subcontractors and was admitting that Kent suffered injury as a result of KBA not paying some subcontractors. In response to an observation by the trial court that Kent still needed to prove the damages alleged in his petition, Kent's counsel stated he believed that they would prove about $20,000 in damages from paying certain subcontractors to release the liens, plus additional damages incurred because of the liens filed against Kent's property, such as Kent's inability to get loans and having to release the liens, and that the evidence was also relevant to show not only a failure of Alexander to pay attention to his business but also the way Alexander did business. The trial court overruled Alexander's objection.

Upon further questioning about the Jerry's Cabinetry's claim and suit, Alexander admitted that to his knowledge, KBA did not pay the claim, that the claim arose out KBA's failure to pay Jerry's Cabinetry for work done on Kent's project, and that Jerry's Cabinetry had filed a lien against Kent's property and

13

sued, claiming it was owed $8,752. Alexander finally admitted: "I don't know exactly who was paid and who was not paid." Yet Alexander continued to insist that, to the best of his knowledge, his company had paid the subcontractors on Kent's project. When asked what he did to satisfy that to-the-best-of-his-knowledge requirement, Alexander could say only that he would inquire and get "different reports back and forth," that he would ask his office what had been paid and what had not been paid, and that he "tried [his] best to assume what the information was." The information would vary from job to job, from month to month. But he did not have an exact recollection.

Kent introduced a letter to Feris Electric & Lighting signed by Alexander and dated September 7, 2007, that stated, "Dear Mitch, we are working very hard to resolve the mess of the Easy Ed's project and remedy the remaining balance owed on your contract for this project." Alexander could not recall exactly what he was referring to back then as "resolve the mess" but assumed it was the close-out of the project—paying the subcontractors the money they were owed and completing the punch list and the close out documents. Alexander admitted that after September 7, 2007, KBA did not directly pay any subcontractors on Kent's project. Instead, Alexander said he had an ongoing relationship with several subcontractors and was able to pay them indirectly by giving them additional work on other projects to make up some of the money not paid to them on Kent's project. He did not dispute that Kent paid the full contract price for the

14

project.  He insisted that the money went to payments to the subcontractors per the terms of the contract.

A fax Alexander sent to Feris Electric & Lighting on March 27, 2007, said: "We are experiencing some un[fore]seen delays in issuing payment for invoices that are currently due."  Alexander explained at trial that the "un[fore]seen delays" were caused by his clients on several projects filing for bankruptcy.  He named Coastal Trucking Company and the Family Partnership as clients who had filed for bankruptcy and mentioned that several other jobs had some contract disputes.  But he could not remember which ones.

Alexander could not give a specific reason why he did not have enough money to pay the subcontractors when Kent had paid him the full contract price. He could not recall, he said, why he did not fully pay Feris Electric & Lighting.  He suggested only that, at that time, they may have been doing some warranty work, or alternatively, there were some close-out items.  He could not remember.  He acknowledged that the November 2006 payment application represented to Kent that previous payments of $27,072 had been made to Feris Electric & Lighting for its work on the project.  But Alexander could not recall if that amount had actually been paid to Feris Electric & Lighting then or if it was paid at a later date.  Nor could he recall how much he paid Feris Electric & Lighting.  On the January 2007 payment application, previous applications paid to Feris Electric & Lighting were shown as $39,020.  But Alexander acknowledged that in September 2007, he

15

offered Feris Electric & Lighting a promissory note for $25,219.50, which he was willing to sign individually, and Feris Electric & Lighting refused to accept it.

Alexander denied he represented to Kent that Feris Electric & Lighting had been paid in the November 2006 and January 2007 payment applications. Alexander insisted that the payment application form was not meant to show how much the subcontractors had been paid but was primarily used to show progress on the job and for the architect to show percentage of completion of the project. But he admitted that the application for payment form was entitled "Application and Certificate for Payment," that he used it to present to Kent to obtain payment of funds from him, and that as of the January 2007 application for payment, Alexander had already received payment from Kent of $346,000 "plus." And he admitted that he had represented in the payment application that "all payments have been paid by the contractor for which previous certificate for payment were issued." He admitted that a balance was still owed to Feris Electric & Lighting at the time and that he did not tell Kent that. He admitted that he did not tell Kent that he was not paying the subcontractors as represented. Had Kent known that there was over $100,000 that the subcontractors on his project had not been paid as represented, Alexander agreed that Kent probably would have had the right not to continue paying KBA. But Alexander did not tell Kent there were unpaid balances owed at the end of the project.

Alexander insisted he did notify Kent that there were some balances still owed on the project and stated that he was in the process of getting them paid.

16

But he informed Kent of this in the correspondence that went "back and forth" between them after Kent had paid in full for the construction and had moved into the building. Specifically, Alexander said, he sent a subcontractor audit update to Kent. Alexander admitted that the update showed that KBA owed more than $80,000 to the subcontractors listed on the audit update. As to what happened to the $80,000 that was not paid to those subcontractors for their work, Alexander said it went to complete other construction projects; there were several going on while KBA was in the process of trying to complete Kent's project.

All funds paid by Kent and by owners on other projects went into KBA's single corporate operating account. Alexander was head and sole owner of KBA. Alexander made his living by construction projects. KBA did not pay him a salary but paid him on draws at certain points. He did not recall how much he was paid by KBA; it could have been anywhere from $2,000 to $50,000. KBA paid $4,000 per month to rent space in a building that was owned by Alex Partners, a partnership owned by Alexander and his father.

Alexander recognized a full waiver and release affidavit and release of lien filed by CBS Mechanical Services, Inc. in October 2007. He admitted KBA did not pay CBS Mechanical for its plumbing work. Alexander said KBA had reached an agreement to settle that account and signed a promissory note to CBS Mechanical for $26,290, but he admitted that KBA was unable to honor it although he thought they made payments toward it. CBS Mechanical's proof of

17

claim filed in KBA's bankruptcy proceeding stated it was owed $26,974, which included interest. Alexander admitted that he had represented in the final payment application for payment submitted to Kent that the scheduled value for CBS Mechanical's services was $24,635 and that CBS Mechanical had been paid when, in fact, it had received nothing. Alexander insisted that KBA made some payments under its settlement agreement with CBS Mechanical but had no documents to substantiate any amounts of additional payments. It was possible, he said, that some of the work was done by another company under the heading of drainage work or excavation, which had a budget of $9,000, and which he represented had been paid.

Alexander admitted that when he certified that all amounts had been paid to subcontractors for work completed, it would be reasonable for someone in Kent's position to rely on that representation. Alexander qualified this admission by stating that "most every client asks for back up," meaning that clients could take advantage of provisions in the construction contract to insist on partial lien waivers but denied that he was urging that because Kent did not ask for back up, he was giving KBA an open door not to pay the subcontractors. He also argued that a customer in most instances, if they had a question, would ask for specific progress lien releases from each subcontractor and that was an option available to Kent under the contract, but Alexander denied that because Kent did not do that, it somehow relieved KBA from paying its subcontractors.

18

Alexander was aware that KBA also still owed S&S Concrete Contractors, Inc., that KBA was probably notified of S&S Concrete's demand for payment, and that S&S Concrete filed a lien against Kent's property. S&S Concrete supplied the concrete and also did the paving on the job. The final payment application presented to Kent for payment represented that S&S Concrete had been paid in full, but S&S Concrete filed a claim for $8,274 after completion of the project. Alexander admitted KBA did not pay S&S Concrete in full, contrary to the final application for payment presented to Kent.

CND Construction provided the drywall work on the project. KBA received a bill from that company for $4,138. Alexander did not recall how much CND Construction was paid. They would normally have been included under the category of interior finishes, which was listed as fully paid, but Alexander did not recall whether everyone was paid on the interior finishes on that job.

Business Flooring Specialists also did work on the project. The final payment application listed the company as having completed its work and that it was paid in full. Alexander also initially testified that it was paid in full. However, he then admitted Business Flooring Specialists had filed an affidavit and mechanic's lien against Kent's property, which he assumed his office was aware of. He knew they sued and got a judgment against KBA and thought they received payment from one of KBA's other projects.

Peterson's Landscape was also a subcontractor on the job. Alexander admitted that it also was not paid in full. It sued KBA and got a judgment for

$6,271.67. Peterson's Landscape filed a claim in KBA's bankruptcy proceeding for $4,012.31; thus, it appeared that KBA paid about $2,000 toward satisfying the judgment.

Lambert Ornamental Iron put fencing around Kent's project. During the same period, Lambert built a fence at Alexander's personal home. Alexander did not believe he used any of the funds from the project to pay for his home's fencing. But he did not know what Lambert would say about it. The final payment request stated that $29,700 had been paid to Lambert for its work.

By a letter of May 7, 2007, Alexander wrote Kent that it was "our full understanding that we owe balances to some of the subcontractors that performed work on your project and it is also our full intention to satisfy the balances owed and obtain full releases of liens for your project." Alexander testified that he assumed that at that time, he had a full understanding that KBA still owed money on the project and that, between January and May of 2007, he was being informed by his office that KBA had not paid some of the subcontractors' bills. After May 7, 2007, the only payments he recalled making were to Peterson's Landscape and to S&S General Building; he gave more work on another project to S&S General Building to help resolve some of the balance owed to it.

Alexander did not know why the twenty-three page summary of schedules of unsecured creditors in KBA's bankruptcy proceeding showed Business Flooring Specialists as "not disputed," CBS Mechanical Services as owed

nothing, Peterson's Landscape as owed one dollar, and Easy Ed's as owed one dollar. Alexander knew that Kent's suit against KBA was filed before KBA filed for bankruptcy, and Kent was regularly letting him know what he claimed KBA owed him for the expense of settling and getting the subcontractors' liens released from his property. Alexander acknowledged he had another dispute going on with another owner over a construction contract at the time he filed for bankruptcy on behalf of KBA, University Church of Christ, but he did not list them as a creditor; he did not know why. Alexander said the figures were put in by his attorneys. During the time frame he was working on Kent's project, he was also working on other projects, including the Education Service Center, the Fort Worth Christian School, some churches, Coastal Transportation, Market Street Village, and a property in Cleburne. Liens were filed in the Fort Worth Christian School project that he thought were satisfied, and a suit had been filed against him by Spence Interior Trim with which he entered into an agreed judgment.

On cross-examination by his own counsel, Alexander testified he signed the construction contract and pay applications as president of KBA on behalf of KBA, the undersigned contractor, not individually. As to the bankruptcy schedules of creditors, Alexander said that the listings for payments owed to CBS Mechanical and to Peterson's Landscape for work on Kent's property were stated to be "zero" and one dollar because of his belief that, since he had settlement agreements with each, they were not owed anything. Easy Ed's claim was listed as one dollar because Alexander did not know how much Kent

21

claimed he was actually due. Alexander further testified (after scolding by the trial court to not just make up stuff or to keep saying simply that he did not know) that counsel prepared the schedules in the bankruptcy proceedings based on documents he furnished and that any incorrect numbers were simply a mistake on his part and not intentional. Alexander said that the schedules for KBA's bankruptcy were based on information he gave to his attorneys and that the information was accurate to the best of his knowledge at the time; he understood those schedules to be correct based on his attorneys' recommendation. Alexander said that he signed the pay applications in reliance upon the information provided to him by his office staff, understanding that the subcontractors had been paid. He never intended for any subcontractor or supplier working for KBA not to be paid or for any project to go unfinished. He attempted to get the subcontractors paid through settlement agreements, promissory notes, promising other work, and offering to be personally liable on notes for some of the debts to make sure the subcontractors understood that he was sincere and intent on trying to get the debts paid.

Alexander testified he did not personally benefit directly from his work for Kent; instead, he lost everything. He lost his building, which he sold in a short sale after it was posted for foreclosure. He was left with a deficiency of $34,185.20, for which he had to guarantee a note to the bank. He testified that over the past five years, he had personally paid over $100,000 to satisfy some of the claims against the business. While the Kent construction job was ongoing,

22

he was already facing legal issues.  The Market Street project was in litigation; the developer placed $475,000 into the registry of the court, and KBA never received those funds.

Alexander explained that he had jobs with bad estimates that he ended up losing money on, and Easy Ed's Autos was one of those jobs.  He testified that decisions about paying subcontractors were made by him based upon "managing the cash flow of the business."  There was never any intent not to pay anybody; he thought KBA went to great lengths to pay everybody.

Alexander admitted he realized KBA was in serious financial distress when it was trying to wrap up the Market Street project in 2005.  He identified a materialman's lien from that project for $156,000 that was signed March 20, 2005.  He did not enter into the contract for Kent's project until over a year later.  Alexander said he was not involved in day-to-day operations and was not paying attention to the bills, and he thought everything was being done the way it was supposed to be done.  He admitted that, at the time he entered into the contract with Kent, he was having financial problems.  At that juncture, he was spending a lot of time trying to collect the $485,000 owed to KBA on the Market Street project, and he had several lawsuits pending against a developer.

In answer to questions by the trial court, Alexander admitted he had access to KBA's bank statements but did not recall doing any due diligence to make sure they were accurate.  He admitted that the $4,000 that came out of KBA's operating account every month was for the rent on the building occupied

23

by KBA. In other words, Alexander admitted, even when subcontractors were not being paid, he managed to pay the rent for the building he owned with his father.

***Testimony of Subcontractors***

Joe Peterson, president of Peterson's Landscape, testified he was "partially" paid but had to take action to enforce the payment. For the first three months or so, every week or every other week, Peterson would stop by KBA's offices or call Alexander, who would tell him that he had never been paid by Kent and could not send Peterson his money until he got paid. After a few months of being told the same thing, Peterson was angry and called Kent to ask him why he had not paid KBA. Kent told him he had paid and showed him proof. Peterson then sued KBA in small claims court and entered into an agreed judgment with KBA. Alexander made a few payments but then stopped three or four months prior to KBA declaring bankruptcy.

Arthur Moses, owner of Ajax Glass and Mirror, testified he contacted Alexander multiple times in June or July 2008 about the money owed to Ajax Glass as a subcontractor. Alexander never told Moses why he could not pay Ajax Glass. Moses said he received only $800 in payment from KBA. He filed a lien against Kent's property for the balance of $18,827.30.

Jerry Eberly, owner of Jerry's Cabinetry, Inc., testified he provided cabinetry services on the project and was not paid. Alexander gave him multiple answers for why he was not being paid, including that he had not been paid by

24

Kent.  But Kent showed him documentation that he had paid KBA.  KBA finally gave Eberly partial payment.

Sanders's company, General Building and Erections, provided the building portion of the roof units and canopies and was not paid.  Sanders testified that Alexander told him KBA did not have the money to pay General Building and Erections but did not tell him why.  Alexander agreed to a note with monthly installment payments.  General Building and Erections did not file a lien on Kent's property.  Sanders stated that he had been in business forty-one years and had yet to file a lien on anyone's property.  Alexander paid half of the note before KBA filed for bankruptcy.  He still owes about half of it.  Sanders was still working with Alexander at the time of trial.

Sanders testified that there were times when either Alexander did not get paid or could not pay, and in those situations, Sanders agreed to give KBA a bid on the next job in which Sanders would be paid a higher amount to pay the one on which KBA still owed him.  At the time of trial, Sanders was working on a job in Grand Prairie for Alexander as general contractor.  In 2012, he had worked on several jobs with Alexander as general contractor, including some Goodwill stores, Service Masters in Euless, CMC Trailers, and Lone Star Forklifts.  Sanders testified he had also done work as a subcontractor for Alexander under the names of three different corporations in addition to KBA.  He said he would bid a job for Alexander today and work for him, provided the contracts are drawn for joint check agreements.

Chris Guensfelder testified he owns Lambert Ornamental Iron, which fabricates and installs ornamental iron, fences, gates, and stairs. He provided a fence and manual slide gate on Kent's project. He also did work on a fence for Alexander's father's home. He did not recall whether he was paid for that work from corporate funds. He invoiced Alexander in November 2006 for the work done on Kent's project and received payment after seven months. KBA's payment was in three or four installments. He recalled making repeated calls to be paid.

### *Judgment*

Following the trial, as relevant to this appeal, the trial court entered written findings of fact and conclusions of law, finding and concluding as follows:

(3)   The subcontractors completed the work on the project and a final draw was presented to Plaintiff on or about January 19, 2007.

(4)   The final draw certified all subcontractors were paid in full and was signed by Keith Alexander and certified by Keith Alexander.

(5)   Plaintiff paid all amounts due under the contract and as provided in the draw applications.

(6)   All checks were paid to Keith Alexander.

(7)   All subcontractors were not paid as represented by Keith Alexander.

(8)   The representations that all subcontractors were paid were . . . false statement[s] made by Keith Alexander.

(9)   Based on the false statements[,] Plaintiff Eddie Kent paid K.B. Alexander Co. of Texas, Inc. all sums due and owing under the contract.

26

(10)   Plaintiff[,] after final payment was made to Keith Alexander[,] discovered all subcontractors on his project were not paid as represented by Keith Alexander.

. . . .

(12)   The representations made to Plaintiff by Keith Alexander were material and relied upon by Plaintiff.

(13)   Keith Alexander knew the representations about subcontractors being paid in full were false when made to plaintiff.

(14)   Plaintiff was damaged by Keith Alexander's false statements.

(15)   Plaintiff was required to defend lawsuits, settle lawsuits, pay mechanic's liens[,] and incur legal expenses that but for Keith Alexander's false statements would not have been expenses the Plaintiff would have incurred.

(16)   Keith Alexander has been involved in a number of projects where project funds were not properly applied to the projects['] expenses. Keith Alexander has been involved in a number of lawsuits and had mechanics [liens] filed on his company's building projects in the past.

(17)   In other building projects[,] the land owners were subject to paying mechanic's liens and [were] involved in lawsuits over payment of subcontractors by Keith Alexander or a company he control[l]ed.

. . . .

(21)   Keith Alexander's actions in filing a mechanic's lien were done to harm the Plaintiff.

(22)   Keith Alexander's failure to pay subcontractors on the Plaintiff's project were a part of planned way of doing business by Keith Alexander and were done to defraud the Plaintiff.

(23)   Plaintiff has incurred actual damages in the amount of $20,061.32.

(24) Plaintiff has incurred legal fees and expenses with the office of David L. Pritchard as of August 1, 2013[,] in the amount $22,249.97.

(25) Plaintiff [has] incurred legal fees with special bankruptcy counsel in the amount of $3[,]000.00[.]

. . . .

(27) Keith Alexander committed fraud by representing to Plaintiffs [that] subcontractors had been paid, when Keith Alexander knew all of said subcontractors had not been paid.

(28) Plaintiff's reliance on said fraudulent representations resulted in the Plaintiff being damaged.

(29) Keith Alexander['s] lien claim was done with the intent to harm the Plaintiff.

(30) Keith Alexander['s] actions were done knowingly with the intent to harm the Plaintiff and subject Keith Alexander to exemplary damages.

## ANALYSIS

Although his issues, as worded, do not expressly challenge the legal and factual sufficiency of the evidence, Alexander's summary of his arguments at the outset of his brief, as well as the substance of his arguments, reveal that he is challenging the legal and factual sufficiency of the evidence to support the trial court's findings. On close scrutiny, all but one of his arguments (that one being his challenge to the verbiage of the pay applications) under his issues are essentially legal and factual insufficiency complaints that we read as "fairly included" in his issues. *See* Tex. R. App. P. 38.1(f) ("The statement of an issue or point will be treated as covering every subsidiary question that is fairly included."), 38.9 (stating that briefing rules should be construed liberally and "are

28

meant to acquaint the court with the issues in a case and to present argument that will enable the court to decide the case").  Consequently, we will consider Alexander's issues under the usual legal and factual sufficiency standards of review.

## STANDARD OF REVIEW

A trial court's findings of fact have the same force and dignity as a jury's answers to jury questions and are reviewable for legal and factual sufficiency of the evidence to support them by the same standards.  *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991); *see also MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 663 n.3 (Tex. 2009).  We defer to unchallenged findings of fact that are supported by some evidence.  *Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*, 437 S.W.3d 518, 523 (Tex. 2014).

When a party challenges the legal sufficiency of the evidence to support an adverse finding on which he did not have the burden of proof at trial, the party must demonstrate that there is no evidence to support the adverse finding. *Thornton v. Dobbs*, 355 S.W.3d 312, 316 (Tex. App.—Dallas 2011, no pet.).  In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not.  *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827

29

(Tex. 2005). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996). More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 262 (Tex. 2002).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). The trial court, as factfinder in a bench trial, is the sole judge of the credibility of the witnesses. *Thornton*, 355 S.W.3d at 315. We review a trial court's conclusions of law de novo to determine whether the trial court correctly drew the legal conclusions from the facts. *Id.* at 316.

## APPLICABLE LAW

"The elements of fraud are a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, *which was intended to be acted upon*, which was relied upon, and which caused injury." *Sears, Roebuck & Co. v. Meadows*, 877 S.W.2d

30

281, 282 (Tex. 1994) (quoting *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex. 1990), *cert. denied*, 498 U.S. 1048 (1991)); *see also Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47–48 (Tex. 1998).

**APPLICATION OF LAW TO ISSUES**

*"Verbiage" of the pay applications*

As part of his first issue, Alexander challenges findings of fact 4, 7, 8, 9, 13, 14, 15, and 22, contending that the language of the pay applications submitted by KBA to Kent—certifying that to the best of KBA's "knowledge, information, and belief . . . all amounts have been paid by the Contractor for Work for which previous Certificates of Payment were issued"—was not the type of affirmative statement of fact actionable for fraud. Alexander places his reliance on a criminal case in which the court of criminal appeals rejected an attorney's affidavit containing the same language in support of a motion for new trial based on jury misconduct because the affidavit stated no positive material fact, did not reveal what information the affiant had or relied upon or its source, and did not state that the affiant had any knowledge of the subject matter.[3] Alexander argues KBA's certification is likewise devoid of substance because it did not assert that KBA had any knowledge on the subject, did not state that KBA had conducted any inquiry, reviewed documents, or completed an audit, and did

---

[3]*Calyon v. State*, 174 S.W. 591, 600 (Tex. Crim. App. 1915), *overruled in part by Means v. State*, 271 S.W. 613, 614–15 (Tex. Crim. App. 1925).

31

not provide a context from which Kent could deduce KBA's knowledge or information. In essence, he contends, it fails to meet the criteria for an affidavit. Therefore, Alexander asserts that the certification does not constitute an actionable statement for fraud.

The issue is not whether Alexander's certification in the applications met all the criteria for an affidavit as required for a motion for new trial or even for a motion for summary judgment but whether, under all of the circumstances viewed most favorably in the light of the trial court's findings and judgment, it constituted a representation that, if false, would constitute an actionable misrepresentation that "all amounts have been paid by the Contractor for Work for which previous Certificates of Payment were issued." There is far more to the payment applications than a general statement with no context from which to determine the affiant's personal knowledge such as in *Calyon*, in which an attorney averred that he had information from an unknown source about jury misconduct. 174 S.W. at 598. Each pay application, signed and sworn to by Alexander as representative of KBA, was supported by a schedule of values specifically listing each category on which work had been done to the date of the application and the percentage of completion of that work to date, as well as the amounts purported to have been previously paid to the subcontractors for each such category. The trial court reasonably could have concluded from the circumstances surrounding the certifications as known to Kent that Alexander, as sole owner of KBA and with over twenty years of experience, was certainly in a

32

position to have personal knowledge of whether he had paid his own subcontractors for the work that previously had been completed. Kent even followed up with KBA's office manager to reassure himself that the subcontractors had been paid before making each of the progress payments. Significantly, Kent's testimony was undisputed that when he approached Alexander about obtaining verification of payment to subcontractors through the architect's optional service provided for that very purpose, Alexander verbally reassured him that it would be a waste of time and told him that Alexander himself would "see that everybody got paid."

It was undisputed and even stipulated by Alexander at trial that, contrary to the representations in the pay applications of November and December 2006, and January 2007, Alexander had not paid subcontractors for work completed in the last three months of the project to the extent of over $100,000, which was not revealed to Kent by Alexander and not discovered by Kent until after Kent paid for completion of the job and after he had moved onto the premises and opened for business. The trial court could also have reasonably concluded that by at least November 2006, Alexander knew KBA could not meet its obligations to its subcontractors for other projects as well as Kent's and had ceased being able to pay the subcontractors. We hold that the trial court did not err in finding that the pay applications misrepresented that all subcontractors had been paid for work completed by them during the previous month.

33

Accordingly, we hold that legally and factually sufficient evidence supports the trial court's findings of misrepresentation and that such misrepresentations constituted fraud in findings of fact numbers 4, 7, 8, 9, 13, 14, 15, and 22, particularly when considered in the light of the surrounding circumstances, including the verbal reassurance to Kent by Alexander that he would see that the subcontractors got paid.[4] We overrule this portion of Alexander's first issue.

### Kent's "equal access" to knowledge

In his second issue, Alexander contends that Kent possessed equal access to knowledge of KBA's payments to its subcontractors by the terms of Kent's construction contract with KBA. Alexander relies upon *Paull v. Capital Resource Management, Inc.*, 987 S.W.2d 214 (Tex. App.—Austin 1999, pet. denied), a case in which investors in working interests in an oil and gas waterflood project sued an oil and gas development corporation and its principals for, among other causes of action, fraud for allegedly misrepresenting that the investment was the "lowest risk" that the sellers had seen and for alleged misrepresentations in a field summary that analyzed economic forecasts, projected productivity, and predicted large revenues and profits from production in an analogous field. *Id.* at 218–19. Affirming a summary judgment in favor of the sellers on the investors' fraud claim, the appellate court held that, because

---

[4]In his statement of issues, Kent states he is challenging findings 3–10, 12–17, and 21–25, but he does not revisit his challenges to findings 3, 5, 6, 10, 12, 16, 17, 21, 24, or 25 in any of his issues. We address his challenge to finding 23 later in this opinion.

the investors were provided all information requested and the field summary was based upon publicly available records of prior oil and gas production history in analogous fields to which the investors had equal access, the investors were prevented from claiming they were defrauded by the company's statements or opinions. *Id.* at 221.

We disagree that *Paull* is analogous. Alexander claims Kent had equal access to subcontractor information and points to the provisions of the contract under which Kent had rights entitling him to lien waivers, claim waivers, and affidavits from the subcontractors on demand as a prerequisite to payment, as well as the right to adjust or reject payment applications or even nullify previously approved applications if KBA failed to properly pay the subcontractors following receipt of payment from Kent. But unlike the records available to the public from analogous oil and gas fields in *Paull,* there were no records accessible to Kent by which he could have learned whether the subcontractors on his job were being paid by KBA. We find no provision in the contract giving Kent any access, much less equal access, to the bookkeeping or other internal records of KBA that would indicate whether or when subcontractors were being paid. Kent testified that when he went to KBA's office each month with a check from the bank to make his progress payment, he would specifically inquire of Riddle whether the subcontractors were paid for their completed work before making his payment to KBA, and Riddle would assure him that they had been paid. And when Kent approached Alexander about the architect's offer of a service to audit whether

35

the subcontractors were properly being paid for completed work, Alexander reassured Kent that he would see that the subcontractors were paid and that Kent did not need to waste money on an audit by the architect to make sure that they were, in fact, paid.

Moreover, it was undisputed that the only person with check-writing authority in the company was Alexander. Thus, the only person who knew whether the subcontractors were paid each month for work completed was Alexander. Alexander certified to Kent under oath in each pay application that the subcontractors had been paid for work completed at the time of each application. The one fact that Kent needed to know—that the subcontractors had been paid—was misrepresented in the pay applications, and thus, Kent had no knowledge, much less equal access to knowledge, that might have alerted him to exercise any of his contractual rights based upon KBA's failure to pay the subcontractors. Once he obtained the knowledge that the subcontractors had not been paid and liens had been filed against his property, and after KBA failed within thirty days, as required by the contract, to remove the liens filed against Kent's property by the subcontractors who had not been paid, Kent exercised his post hoc contractual remedy of negotiating and settling the claims for KBA's nonpayment of subcontractors with his own funds, obtained releases of the liens placed against his property, and filed this suit against Alexander and KBA for recovery of his costs, expenses, and attorney's fees. Accordingly, we overrule Alexander's second issue.

***Kent's Reliance was "Justifiable"***

Alexander argues by his third issue that the evidence is factually insufficient to establish that Kent's reliance on the pay applications was "justifiable" in light of Kent's awareness of the risk that KBA would not pay the subcontractors and because Kent failed to exercise due diligence in asserting his negotiated contractual rights, which, Alexander says, would have protected his interests.  Assuming that Kent had the burden to establish that his reliance on the pay applications was justifiable, Kent's contractual rights gave Kent no protection absent knowledge that the subcontractors had not been paid by KBA.  Instead, the contract expressly conditioned any right Kent would have to receive partial lien waivers and affidavits from subcontractors on his payment of amounts due to KBA on the pay applications.  Likewise, although Kent had the right, upon written notice to KBA to "adjust" or "nullify" any previously approved payment application and to withhold payment to the extent KBA was responsible for failure to pay subcontractors, that right could do him no good when Alexander misrepresented in the pay applications that subcontractors had been paid.  Alexander cites no evidence that Kent had reason to suspect otherwise.  And Kent expressly inquired and was reassured both by the office manager and by Alexander that the subcontractors had been paid before making his three final payments.  We overrule Alexander's third issue.

***Intent Not to Perform***

By his fourth issue, Alexander contends there is no evidence that he had no intent to pay the subcontractors before the contract was executed, arguing that a plaintiff must show that a defendant had no intention to perform when it made a promise or entered into the contract in order to support a claim of fraud. Alexander points out that KBA completed the project, that Kent was happy with the work, and that KBA partially performed by paying some of the subcontractors. Alexander contends that his failure to pay all of the subcontractors was, at most, a breach of the contract that, standing alone, is not evidence of intent not to perform when the contract was made.

This argument might have merit if Kent had alleged and attempted to prove a claim of fraud in the inducement of the contract when the contract was executed on August 25, 2006. *See Haase v. Glazner*, 62 S.W.3d 795, 798–99 (Tex. 2001) (stating that fraudulent inducement is a "particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof. That is, with a fraudulent inducement claim, the elements of fraud must be established as they relate to an agreement between the parties."). But Kent did not allege or attempt to prove fraud in the inducement of the contract. In his original petition, which was Kent's live pleading at trial, Kent alleged that "Defendants induced Plaintiff to make payments under the agreement by presenting Plaintiff with statements signed by Defendant Keith B. Alexander that claimed all the subcontractors had been paid in full." Kent further

38

alleged that the statements were false and were relied upon by him to his detriment, proximately resulting in damages of having liens placed on his property, a reduced credit rating, liability to subcontractors, and an inability to get the remainder of the contract completed. In conformity with his pleadings, Kent never contended at trial that he was fraudulently induced into the contract but put on evidence that the misrepresentations in the last three pay applications of November and December 2006 and January 2007 certifying that subcontractors had been paid caused him to make the final three progress payments to KBA on the contract when he would not have done so otherwise and could have avoided the mechanic's and materialmen's liens being placed on his property and the expense of paying the subcontractors himself and getting the liens released. We overrule Alexander's fourth issue.

### Individual Liability of Alexander

By his fifth issue, Alexander asserts that he cannot be individually liable because he was not a party to the contract and signed the contract and the pay applications only in his corporate capacity as president of KBA. First, he contends there is no evidence that he acted in his individual capacity in representing "that all amounts have been paid by the Contractor for work for which previous Certificates of Payment were issued and payments received from Owner." Alexander argues that this statement contained in each application for payment presented to Kent shows on its face that it is the statement of the corporation, not Alexander, individually. Secondly, Alexander contends that he

39

cannot be held individually liable because a corporate officer cannot be held liable for inducing the corporation to violate a contractual obligation as long as he acted in good faith, and Kent failed to produce any evidence that Alexander acted in a manner so contrary to the best interest of the corporation that his actions could only be motivated by personal interest. Alexander did not argue these theories in the trial court. Because legal insufficiency of the evidence may be raised for the first time on appeal from a judgment after a nonjury trial, however, these theories are properly raised in that context, and we will consider them. *See* Tex. R. App. P. 33.1(d).

Alexander relies upon *Leitch v. Hornsby* for the proposition that a corporate officer's acts taken on the corporation's behalf are deemed corporate acts. 935 S.W.3d at 117. In *Leitch,* the Texas Supreme Court held that officers and directors of the plaintiff's corporate employer could not be held liable for negligence in failing to furnish the plaintiff with safety equipment that could have prevented his work-related injuries*. Id.* at 120. This was because the employer corporation, but not the individual corporate officers, owed a nondelegable duty to provide an employee of the corporation a safe workplace. *Id.* at 117–18. *Leitch* has no application to this case because that case involved liability of a corporate agent to an employee of the corporation, not liability to a third party. *See id.*; *see also PWS Food, Inc. v. Taco Bell Corp.*, No. 05-01-01211-CV, 2002 WL 523697, at *7 n.3 (Tex. App.—Dallas Apr. 9, 2002, no pet.) (not designated for publication).

40

The general rule in Texas has always been that "[a] corporation's employee is personally liable for tortious acts which he directs or participates in during his employment." *Gore v. Scotland Golf, Inc.*, 136 S.W.3d 26, 32 (Tex. App.—San Antonio 2003, pet. denied); *see Graham Land & Cattle Co. v. Indep. Bankers Bank*, 205 S.W.3d 21, 32 (Tex. App.—Corpus Christi 2006, no pet.) ("[A]n employee who commits, directs[,] or participates in a tortious act while acting within the scope of his employment is personally liable for those acts."); *Morris v. Kohls–York*, 164 S.W.3d 686, 695 (Tex. App.—Austin 2005, pet. dism'd) ("Corporate agents are individually liable for fraudulent or tortious acts committed while in the service of their corporation."); *Cimarron Hydrocarbons Corp. v. Carpenter*, 143 S.W.3d 560, 564 (Tex. App.—Dallas 2004, pet. denied) ("It is a longstanding rule in Texas that a corporate agent is personally liable for his own fraudulent or tortious acts, even when acting within the course and scope of his employment.").

In a footnote, Alexander cites *Karl & Kelly Co., Inc. v. McLerran*, 646 S.W.2d 174, 175 (Tex. 1983), to suggest that individual liability against him is impossible without piercing KBA's corporate veil, which Kent never alleged nor sought to prove. *McLerran* was implicitly overruled by the supreme court in *Light v. Wilson*, 663 S.W.2d 813, 814–15 (Tex. 1983). *See Miller v. Keyser*, 90 S.W.3d 712, 717 (Tex. 2002) (agreeing with concurring opinion in *Light*, which stated that *Light* implicitly overruled *McLerran*). In the same vein, Alexander also argues that an officer is insulated from individual liability for his own actions if

41

they are taken in his capacity as an agent of the corporation and on its behalf. To the contrary, this argument merely brings us full circle back to "the longstanding rule in Texas . . . that '[a] corporation's employee is personally liable for tortious acts which he directs or participates in during his employment.'" *Kingston v. Helm*, 82 S.W.3d 755, 758 (Tex. App.—Corpus Christi 2002, pet. denied) (quoting *Leyendecker & Assocs., Inc. v. Wechter*, 683 S.W.2d 369, 375 (Tex. 1984)). "The law is well-settled that a corporate agent can be held individually liable for fraudulent statements or knowing misrepresentations *even when they are made in the capacity of a representative of the corporation.*" *Kingston*, 82 S.W.3d at 759 (emphasis added); *see Sanchez v. Mulvaney*, 274 S.W.3d 708, 712 (Tex. App.—San Antonio 2008, no pet.) (holding corporate agents liable for their own fraudulent and tortious acts even when acting within the course and scope of their employment); *see also Shapolsky v. Brewton*, 56 S.W.3d 120, 133 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) ("It is the general rule in Texas that corporate agents are individually liable for fraudulent or tortious acts committed while in the service of their corporation."), *disapproved of on other grounds by Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 788–89 (Tex. 2005). In an action seeking to hold an officer liable for his own fraudulent statements, the corporate veil is not required to be pierced. *Sanchez*, 274 S.W.3d at 712; *Kingston*, 82 S.W.3d at 766.[5] We overrule Alexander's fifth issue.

---

[5]Alexander's argument that there is no evidence that Alexander acted in a

42

### Attorney's Fees

By his sixth issue, Alexander asserts that the trial court's award of $22,249.97 for attorney's fees and $3,000 for additional bankruptcy counsel fees is supported by neither the law nor the evidence. We agree. A plaintiff may not recover attorney's fees in a common-law fraud action. *See MBM Fin. Corp. v. The Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 667 (Tex. 2009) (holding attorney's fees not recoverable for fraud even if fraud claim arose from breach of contract); *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311–12 (Tex. 2006) (same). Because Kent's action against Alexander was based on fraud alone, he is not entitled to recover attorney's fees for prosecuting this action.

Additionally, Kent is precluded from recovering the $3,000 the trial court awarded as special bankruptcy fees. He testified he retained legal counsel to attempt to place KBA into involuntary bankruptcy in order to collect from KBA the amounts he paid to subcontractors. He was later convinced by Arthur Moses of Ajax Glass to abandon the idea of putting Alexander into bankruptcy. Those fees were not reliance damages, nor were they shown to have been caused by the fraud. They also were not proved up by expert testimony or any other evidence that they were reasonable or necessary. We sustain Alexander's sixth issue.

manner so contrary to the best interest of the corporation that his actions could only be motivated by personal interest, is likewise inapplicable to this case. Alexander cites *Holloway v. Skinner*, 898 S.W.2d 793, 795 (Tex. 1995), for the test for individual liability of a corporate officer. But *Holloway* involved a cause of action against a corporate officer in his individual capacity for tortious interference with a contract between the corporation and a third party. *Id.* at 794. Kent did not assert a claim for tortious interference with contract.

*Damages*

In the remaining part of his first issue, Alexander contends Kent failed to produce even a scintilla of evidence that the payment applications admitted at trial "were tied to his actual damages" found by the trial court.  We will liberally construe this contention as a complaint of no evidence to support the trial court's findings that Kent was damaged by Alexander's false statements (finding no. 14); that Kent was required to defend and settle lawsuits, to pay mechanic's liens, and to incur legal expenses that he would not have incurred but for Alexander's false statements (finding no. 15); and that Kent incurred actual damages of $20,061.32 (finding no. 23).

As we related in summarizing the evidence, Kent testified he understood that each payment application Alexander presented to him certified that subcontractors had been paid in full for the work they had completed the previous month.  And Kent said that he relied upon those certifications in making payments and would not have made the payments to KBA as requested in the last three applications for payment had he known that subcontractors were not being paid.

Alexander admitted that he had represented that he had paid the subcontractors as he had certified in the payment applications he presented to Kent. He further acknowledged that the construction contract put the responsibility for payment of liens on KBA, that liens were filed against Kent's

44

property on the project by unpaid subcontractors, and that KBA was not able to satisfy all of them.

As to his damages for payment to release the lien of Business Flooring Specialists, Kent testified that the final payment application dated January 2007 listed that subcontractor as having completed its work and that it was paid in full. Alexander also testified he had paid that subcontractor in full. But he later acknowledged that Business Flooring Specialists filed an affidavit and mechanic's lien against Kent's property for unpaid amounts due, which he assumed his office was aware of, and knew that the subcontractor sued and got a judgment against KBA. Kent testified he paid Business Flooring Specialists $6,271.67, fifty percent of its claim, to settle with it and obtained an assignment of its lien.

Alexander also admitted that Ajax Glass, another subcontractor on Kent's project, was never paid "in full." There was a payment shown as having been made to Ajax Glass by KBA for $18,510. But the lien affidavit filed by Ajax Glass in support of its lien against Kent's property showed an amount unpaid and owing of $18,827.30. Alexander admitted KBA paid Ajax Glass less than $1,000. The lien affidavit filed by Ajax Glass against Kent's property stated KBA had paid Ajax Glass only $800. Kent testified he paid Ajax Glass $9,413.65.

Alexander admitted that, to his knowledge, KBA did not pay Jerry's Cabinetry for its work as a subcontractor, that Jerry's Cabinetry's claim against Kent arose out of KBA's failure to pay Jerry's Cabinetry for its work on Kent's

45

project, and that Jerry's Cabinetry filed a lien against Kent's property and sued Kent, claiming it was owed $8,752. Kent settled with Jerry's Cabinetry and obtained an assignment of its lien for $4,376.

As to each of those liens filed against Kent's property for amounts not paid by KBA to those subcontractors, and contrary to the representations made by Alexander in the payment applications, Kent testified:

> Q. All right. And each one of these pay applications, after you had the opportunity to do what review you could, you paid him; is that correct?
>
> A. Yes, sir.
>
> Q. And as a result of the pay applications not being -- or all of the subcontractors not being paid, you have heard testimony, you've heard that -- you've settled with several people; is that correct?
>
> A. Yes, sir.
>
> Q. Okay. And who did you settle with, sir?
>
> A. I settled with Mr. Moses of Ajax Glass, and Mr. Eberly [of Jerry's Cabinetry], and Jeff Bennett . . . [of] . . . Business Flooring Special[ists], [which] were the three that there's cashier's checks in the exhibits where they were all paid, and they all assigned me the lien.

Even though the cashier's checks themselves were not admitted (the trial court sustained Alexander's hearsay objection to them), Kent testified to the amounts he paid to each of those three subcontractors to settle with them and obtain assignments of their liens against his property, which totaled precisely the amount of damages awarded to him of $20,061.32, as the trial court found. Alexander did not dispute that Kent settled with the three subcontractors for that

46

amount. Accordingly, we hold that legally sufficient evidence supports the trial court's findings that Kent incurred damages of $20,061.32 as a result of his reliance on Alexander's misrepresentations. We overrule the remainder of Alexander's first issue.

By his seventh issue, Alexander contends that the evidence is factually insufficient to support the damages of $20,061.32 that the trial court found were sustained by Kent and awarded to him in the judgment against Alexander. It is undisputed and Alexander acknowledges that Kent testified that he settled with the three subcontractors who had filed liens on his property by paying them the following sums in exchange for an assignment of their liens: $6,271.67 paid to Business Flooring Specialists; $9,413.65 paid to Ajax Glass; and $4,376 paid to Jerry's Cabinetry, for a total as found by the trial court of $20,061.32.

Alexander contends that Kent admitted that he did not pay the last pay application presented to him by KBA of $6,637. Alexander contends that when that amount is subtracted from the total amount of $20,061.32 paid to the subcontractors, Kent's damages total no more than $13,424.32. But Kent testified that he paid the contract in full. His last payment to KBA supported by a pay application from KBA was $38,210. We have found no pay application in the record for $6,637. KBA did file a lien in 2009 on Kent's property with an unsigned application for payment (dated July 5, 2007) for a balance Alexander claimed Kent still owed of $4,637, plus eighteen percent interest. But Alexander

47

acknowledged he did not recall such an application for payment ever being presented to Kent.

The amount of any such balance owed on the contract by Kent, assuming such to be true, is apparently intended by Alexander to be in the nature of an offset. But Alexander is not entitled to an offset in the amount he now claims. Any such amount owed by Kent on the contract would have been owed only to KBA, the corporation with whom Kent contracted for the construction and which he agreed to pay, not to Alexander, individually. This suit is against Alexander, individually, for the damages to Kent resulting from Alexander's fraud.

Moreover, Alexander is making this claim for the first time on appeal. The right of offset, setoff, or reimbursement is an affirmative defense that must be pled and proved by the party asserting it. *See Smith v. Davis*, 462 S.W.3d 604, 614 (Tex. App.—Tyler 2015, pet. denied) (op. on reh'g); *Tenet Health Sys. Hosps. Dallas, Inc. v. N. Tex. Hosp. Physicians Grp., P.A.*, 438 S.W.3d 190, 204 (Tex. App.—Dallas 2014, no pet.) (citing *Brown v. Am. Transfer & Storage Co.*, 601 S.W.2d 931, 936 (Tex. 1980)). Generally, an affirmative defense must be pled in a responsive pleading, or the defense is waived. *See* Tex. R. Civ. P. 94; *MAN Engines & Components, Inc. v. Shows*, 434 S.W.3d 132, 136–37 (Tex. 2014) (stating Rule 94 makes clear that affirmative defenses must be raised in pretrial pleadings); *Shoemake v. Fogel, Ltd.*, 826 S.W.2d 933, 937 (Tex. 1992) (stating affirmative defense waived if not pled). Alexander filed only a general denial in response to Kent's original petition and never amended his answer to

48

assert offset or any other affirmative defense or counterclaim for the amount he now claims Kent owes. There is also no indication in the record that the parties tried such a claim for an offset by consent. *See Smith*, 462 S.W.3d at 614; *see also Hartford Fire Ins. Co. v. C. Springs 300, Ltd.*, 287 S.W.3d 771, 779–80 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (noting trial by consent is reserved for exceptional cases, and we review the record not for admission of relevant evidence on the issue, but rather for evidence of trial of the issue).

Because Alexander is not entitled to assert any balance owed on the contract to KBA as an offset to the damages awarded against him individually for fraud and because any such right to an offset is waived because it was never pled or tried by consent, we overrule Alexander's seventh issue.

**CONCLUSION**

Having sustained Alexander's sixth issue complaining that Kent is not entitled to attorney's fees for this suit or to special bankruptcy fees, we reverse the trial court's judgment as to those fees in the total amount of $25,249.97 and render judgment that Kent take nothing on his claim for attorney's fees. Having overruled Alexander's first through fifth issues and his seventh issue, we affirm the judgment in favor of Kent and against Alexander for damages in the amount of $20,061.32, plus prejudgment and postjudgment interest and costs of court as awarded by the trial court.

/s/ Anne Gardner
ANNE GARDNER
JUSTICE

PANEL: DAUPHINOT, GARDNER, and WALKER, JJ.

DELIVERED: November 5, 2015

50